KARLA L. BRANDT, Plaintiff-Appellee, *v.* RONALD V. BRANDT, Defendant-Appellant.

First District (4th Division)    No. 80-3214

Opinion filed August 27, 1981.—Rehearing denied September 21, 1981.

Kenneth A. Green, of Chicago, for appellant.

James L. Brendemuhl, of Shimeall & Brendemuhl, of Schaumburg, for appellee.

Mr. JUSTICE LINN delivered the opinion of the court:

Ronald V. Brandt appeals from orders entered in the circuit court of Cook County denying a transfer to him of the custody of his two minor daughters; granting his former wife, Karla L. Brandt, certain claimed arrearages of support and alimony; and awarding to his former wife costs and attorneys fees.

The primary issues raised in this appeal are: (1) Is there now established in Illinois, through the pronouncement of the supreme court in *Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, 400 N.E.2d 421, *cert. denied* (1980), ___ U.S. ___, 66 L. Ed. 2d 155, 101 S. Ct. 329, a *per se* rule requiring a change in custody of minor children where the custodial parent cohabits, in the children's presence, with a member of the opposite sex openly and on a continuing conjugal basis? (2) If there is such a *per se* rule, does it apply even though there is no direct evidence that the custodial parent's life-style affects the children in any adverse way?

We believe that a *per se* rule has not been established. We believe the present stance of our law requires that the trial court give due consideration to the custodial parent's living arrangement and its effect on the well-being of the children but that this is a factor, among others, to be considered in determining whether a change in custody is warranted.

We affirm the trial court's order denying the father's request of custody of the minor child, Sandra. We reverse the trial court's order denying the father's request of custody of the minor child, Kimberly. We affirm the trial court's orders relating to the father's obligation to pay certain support and alimony allowances and attorneys fees. We remand for the entry of an appropriate visitation order and for such other orders as are required to implement the terms of this opinion.

*Background Facts*

Ronald and Karla Brandt were married in 1960, separated in 1976, and divorced in 1977. Four children were born to the parties. The eldest child, Tammy, has reached majority, is married, and is not involved in this proceeding. The next eldest child, Ronald, is 16 and has resided with his father and step-mother for over 3 years. The parties agree that custody of Ronald should remain with the father. Sandra, 15, resides with her mother and her mother's married male friend. Kimberly, 14, has resided with her father and step-mother since August 1980. The custody issue concerns Sandra and Kimberly.

Under the terms of the divorce decree entered in an uncontested proceeding in the circuit court of Cook County on September 20, 1977, and pursuant to a court approved marital settlement agreement, Karla was awarded custody of the parties' four children. Ronald was granted liberal visitation. He was directed to pay Karla $800 per month as unallocated alimony and child support allowances. The support and alimony allowances were to be reduced and ultimately terminated upon the happening of certain events as detailed in the decree. The marital residence, located at Hanover Park, was awarded to Karla. Provisions with reference to the maintenance of various types of insurance, the division of personal property, the payment of debts, the responsibility for the children's education expenses and related matters likewise were incorporated in the decree.

Following the emancipation of Tammy, the parties, by written agreement, but without court order, reduced the support and alimony allowances to be paid by Ronald to $700 per month. Although the child Ronald began living with, and was, for all purposes, in the physical custody of his father, no reduction in the unallocated support and alimony allowances was instituted. Ronald continued to pay Karla $700 per month until December 1, 1979, when he, unilaterally and over the objection of Karla, reduced the payment of allowances to $400 per month.

On September 27, 1979, Ronald filed his petition seeking custody of Sandra, then 14 years old and Kimberly then 12. The principal evil complained of was "that Karla L. Brandt harbors within the home, where said minor children reside with respondent, a man to whom she is not

married, and from all appearances, respondent is living in an open state of adultery with said man in the presence of said minor children; that said condition will, if allowed to continue, greatly affect the morals and welfare of said children." A further portion of the later expanded petition alleged that the environment in which the children were being raised "is detrimental to the morals and well being of the minor female children * * *." The record fails to disclose the filing by Karla of any answer to Ronald's petition although the proceeding continued on as a contested custody matter. At no stage of the proceedings, including this appeal, has there been a denial by Karla of her living openly and continuously with her married male friend since 1979.

Following an abbreviated hearing before the trial court on September 27, 1979, an order was entered directing that the minor children be brought before the trial court on October 10 for the purpose of the trial court's *in camera* examination. At the hearing on October 10, Karla testified as to her relationship with her male friend. She explained that she had discussed with her daughters the fact that her friend would come to live with them and that the children were in favor of the arrangement. She asserted, "[T]he kids wanted a man around the house. They know him very well. They love him. He helps them with their work. He takes a great interest in them. I didn't want to marry him for the sole purpose of—I wanted to make sure it would work beforehand, before I got into another situation, because I can't afford to lose anymore, because I just would be out in the cold * * *. I've known him for about three or four years, maybe more than that * * *. Yes, I love him. Yes, we do [share the same bedroom] in my home * * *; [the girls sleep] in their own room. [This has been going on] about a year or less." Karla also testified that neither she nor her friend had regular employment but that on occasion they would attempt to resell certain discarded "flea market" items that they accumulated and refurbished and that sometimes they earned money by cleaning attics and basements.

At the conclusion of the presentation of additional testimony, the trial court conducted an *in camera* hearing with the minor children. Counsel for the parties were present but no court reporter was in attendance, though one is required by law. (Ill. Rev. Stat. 1979, ch. 40, par. 604(a).) The record fails to disclose the substance of the conversation among the trial court, the children, and counsel other than the trial court's later observing, "[T]he girls seem very well adjusted * * *. [T]hey're lovely children." Thereupon, the trial court entered its order directing that the status quo regarding the children's residency and custody remain in effect and appointing the Cook County Department of Supportive Services to investigate and report to the court as to "the living and school conditions of said children." Further hearing was continued to January 11, 1980.

On January 11, Karla filed her petition seeking enforcement of the obligation of Ronald to pay allowances of $700 per month. She claimed that beginning December 1, 1979, and over her objection, Ronald unilaterally reduced her allowances to $400 per month. Hearing regarding the claimed arrearages and Ronald's request for an adjustment of the amounts to be paid by him as well as the issue of custody was then deferred and ultimately reset for May 12, 1980.

The hearing on May 12 involved the presentation of testimony and evidence regarding the financial issues—the arrearages claimed by Karla and the adjustment of allowances claimed by Ronald. Additionally, the written report of the case worker for the Cook County Department of Supportive Services who accomplished the investigation of the "living and school condition of said children" was presented to the court and copies were made available to counsel for the respective parties. The record discloses a perfunctory stipulation between counsel to excuse the case worker from testifying and to allow the court and counsel to rely on the written investigation report and to admit the document as evidentiary matter on behalf of both parties. No challenge as to the legality of that procedure was asserted.[1]

Karla was called as an adverse witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60). Her testimony essentially conformed to that presented by her on October 10, 1979. The fact that Karla's male companion was still married and that Karla and he continued to reside and cohabit together in her home in an open relationship was again established. She agreed that were she to remarry, she would not lose any interest in the marital residence awarded to her under the terms of the divorce decree. She acknowledged her intention to continue her relationship, saying: "Yes, I would. I have not hid that fact. And I am not going to hide it from the court. I have no intention of marrying him now. I have not hid that from the court. * * * He has helped me. My plans are to live with him. I don't know what I would do without him, to tell you the truth * * *. If the court rules that I should not live with him, I will tell him to get out. I am not afraid to tell him to leave. I want my children."

Ronald testified as to his financial status and the basis for his requesting an adjustment downward of the allowances for which he is or might be obligated. He related the manner and circumstances of his

---

[1] Section 605(c) of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 605(c)) provides in part:
> "The court shall not examine the investigator's report and it shall only be used for impeachment purposes * * *. Any party to the proceedings may call the investigator, or any person whom he has consulted, as a court's witness, for cross-examination. A party may not waive his right of cross-examination prior to hearing."

remarriage on May 12, 1978 (including the fact that he resided with his present wife and her two minor children in her home for about a month prior to the marriage). He also testified as to the good relationship existing between his son and his two stepchildren, the adequate physical facilities available in his home to meet the needs of Sandra and Kimberly were they to reside with him, the close relationship among his and his wife's children, and the desire of his present wife to have his children reside with her and her family members. (At a subsequent hearing Ronald's wife so testified and also described the warm relationship existing between her and the Brandt children.) The hearing was then continued to July 16, 1980. Certain financial documents were to be submitted by Ronald to counsel for Karla, and Ronald was directed to pay her counsel $300 towards attorneys fees.

At the hearing of July 16, Karla, Ronald, and Ronald's present wife testified. Kimberly also testified briefly to a matter not directly related to the custody issue. The details of Karla's home life and that of Ronald and his wife were again presented. The children's apparent friendly feelings toward all of the principals were explored. The very substantial disparity between Ronald's testimony as to his income and resources and what was disclosed by documentary evidence was examined. It was clearly indicated that Ronald's actual income and resources vastly exceeded that to which he had testified.

The final hearing on the issue of custody of Sandra and Kimberly took place on July 23, 1980. The record discloses an unsuccessful attempt by each of the parties to attack the character and personality of the other and to suggest a degree of unfitness for custody going beyond any of the facts already established in the prior hearings. Interpersonal relationships, the childrens' attitudes, peer conduct, educational and religious experiences were the subject of further testimony. No unusual or alarming factors regarding the children's functioning were brought to the attention of the trial court. All of the testimony indicated that the children were in excellent physical and mental health, were doing well in school and were conforming to whatever reasonable demands were made of them.

Kimberly was called to testify by her mother. She told of the close ties with her mother and of being treated well by her. Kimberly expressed no negative feelings towards any members of her immediate family, her mother's friend, or her stepmother or her stepmother's children. She volunteered that she had no friends but could not explain if it was related to the fact that her schoolmates were aware of her mother's friend residing with them.

Sandra also was called to testify. She asserted that she had a very close and positive relationship with her mother. She had no objection to her mother's companion residing with them and she got along well with

him. Sandra said she was not close to her father nor did she have positive feelings towards her stepmother and her stepmother's children—she did not want to live with them.

At that point in the hearing counsel agreed to present closing arguments regarding the custody issue and to defer, for a subsequent time, the determination of the financial matters in controversy. Up to this point in the litigation, except for the admitted "living together," no direct or affirmative evidence was presented to support a modification of custody pursuant to section 610(b)(3) of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 610(b)(3)) which warrants a change where "the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him."

In closing argument, counsel for Ronald pointed to the relationship of Karla and her male friend and their living together openly within the same home where the children resided. Counsel cited and relied primarily on the case of *Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, 400 N.E.2d 421, *cert. denied* (1980), ___ U.S. ___, 66 L. Ed. 2d 155, 101 S. Ct. 329, to support his contention that Karla's relationship with her male companion coupled with the living arrangements shown by the evidence mandated an immediate change of custody of the minor children from Karla to Ronald.

In closing argument, counsel for Karla urged that Ronald failed to meet the requirements of section 610(b)(3) of the Marriage and Dissolution of Marriage Act and that the evidence presented by Ronald did not warrant a change in custody considering the best interests of the young girls. Additionally, counsel for Karla made reference to the trial court's *in camera* interview with the children and the children's expressed preference to remain with their mother. Further, counsel called to the trial court's attention the case worker's investigative report, a copy of which, by apparent agreement of the parties, had been given to the trial court. The report contained the investigator's recommendation that the children remain in the custody of their mother. Counsel for Karla also argued that no evidence had been presented to indicate that Karla's conduct in continuing to reside with her male companion caused any emotional, physical or moral harm to the children. Counsel agreed that the key issue presented to the trial court for determination "is whether the open and continuous cohabitation of the custodial parent with a member of the opposite sex required a change of custody."

On July 29, 1980, the trial court's order denying Ronald's petition seeking a change of custody was entered. The children were to continue to live with their mother. Custody of the parties' son, Ronald, was formally transferred of record to Ronald. The matters relating to the

financial issues and the award of requested attorneys fees were continued for hearing and determination to September 8, 1980.

The trial court, commenting on its determination of the custody issue observed, "After *in camera* conversations with the children and talking to all parties, I do not approve of her [Karla's] environment [but] I don't think there will be any future harm because of the moral atmosphere, I think they should live with whom they are most comfortable."

On August 20, 1980, Ronald presented his "Emergency Motion to Modify Order Entered July 29, 1980." The motion claimed that since the entry of the order of July 29, Kimberly both orally and in writing, expressed her strong desire to reside with Ronald; that Kimberly disclosed having great fear of her mother and described her continuing unhappiness in residing in her mother's home; that Kimberly had been fearful and frightened and thus failed to express her true feelings at the earlier *in camera* interview with the trial court on October 10, 1979. Ronald's motion sought the trial court's reconsideration of its order of July 29 and again asked that custody of Kimberly and Sandra be awarded to him.

The parties, their counsel, and Kimberly appeared before the trial court on August 20. By agreement, both counsel and Kimberly participated in a hearing (later transcribed) in the trial court's chambers. In chambers, Kimberly expressed her sincere and unqualified desire to reside with her father. In general terms, she explained that her fearfulness and nervousness were the reasons why she had not so expressed herself when originally interviewed by the trial court. Kimberly described the breakdown of her previously warm relationship with her mother. She and her mother were engaged in continual bickering and misunderstanding. She urged the trial court to allow her to live with her father and stepmother. The trial court, in a painstaking manner, conducted an in-depth questioning of Kimberly, carefully seeking out the motivation for the minor child's change in attitude and the degree of the sincerity of the child's present expressed desire for the requested change.

After statements by respective counsel and comments by the respective parties, the trial court entered its order which, in effect, modified the custody order of July 29. The order provided that custody of Kimberly remain with Karla but that "temporary physical custody" be with Ronald, the foregoing provisions to be subject to review at a later date. The order also directed that "counselling" be provided Kimberly. The order was later expanded by the trial court's order of September 8 which sets forth the "counselling" provision in greater detail. Further hearings were deferred to a later date.

On November 13, 1980, the parties, Kimberly and both counsel again appeared before the trial court. A hearing in chambers with counsel and Kimberly present took place. Again, the trial court carefully questioned

the minor as to the minor's activities, relationships, expectations, and her expressed desire regarding the matter of her custody. Kimberly stated she desired to remain with her father although, in the intervening months of her residence with her father, her relationship with her mother had improved and she had regularly visited with her mother.

The hearing of the parties before the trial court then resumed. At the conclusion of the hearing, the trial court entered its order again affirming that the custody of Kimberly remain with Karla but that the "temporary physical custody" of Kimberly be with Ronald until the end of the 1980-81 school year.[2] Kimberly was to continue with her "counselling and therapy" on a regular basis. The issue relating to the claim with Karla's counsel for costs and attorneys fees to be paid him by Ronald in the claimed amount of $4155.25 was continued for later determination as were all other financial issues including the support and alimony allowances to be paid by Ronald.

On November 21, 1980, following another hearing and after the trial court's expressed consideration of all of the evidence and exhibits presented regarding the financial issues, the trial court entered its order. In passing, the trial court made reference to its resolution of the custody issue and commented on various evidentiary matters stated, "[T]here didn't seem to be any evidence that the live-in situation was harming the children." The trial court then spoke of its analysis of the financial data submitted to it and referred to its understanding of the applicable law. The statements of counsel as to the attorneys fees and costs claimed as due and owing by Ronald were presented. Further argument was presented with reference to the support and alimony due and owing and that which was to be paid in the future by Ronald.

The November 21 order then provided that Ronald pay $3000 of Karla's attorneys fees. Ronald was also ordered to pay Karla $3100 as an arrearage of allowances due her, the court having concluded that Ronald wrongfully reduced the allowances without prior court approval. Further, Ronald was directed to pay Karla as child support for Sandra $300 per month until such time as Kimberly resumed residing with Karla at which time the trial court would redetermine the amount of child support to be paid by Ronald. The order also set forth, "That at the present time Karla Brandt is not entitled to receive maintenance from Ronald Brandt." See Ill. Rev. Stat. 1979, ch. 40. par. 510(b).

On December 18, 1980, Ronald filed his appeal from the orders denying him the custody of Kimberly and Sandra, the granting of claimed arrearages of child support and alimony, and the awarding of attorneys fees to counsel for Karla.

---

[2] By order of this court, the foregoing arrangement of "temporary physical custody" remains in effect pending the filing of this opinion.

I

*The Custody Issue*

The position taken by Ronald is that the acknowledged lifestyle indulged in by Karla, living with a married man in an open, notorious and continuing conjugal manner in the presence of her minor daughters, mandates that custody of the children be transferred to him. Furthermore, Karla's avowed declaration that she will continue in the living arrangement with her married friend, short of the court's order to desist, makes the custodial change even more compelling. Ronald points to the provisions of section 610(b)(3) of the Marriage and Dissolution of Marriage Act which reads:

> "The court shall not modify a prior custody judgment unless it finds, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interest of the child. In applying these standards the court shall retain the custodian appointed pursuant to the prior judgment unless:
>
> * * *
>
> (3) the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him." Ill. Rev. Stat. 1979, ch. 40, par. 610(b)(3).

Ronald asserts that the living arrangement established by Karla is inimical to the best interests of the children; that the environment in which the children reside with Karla and her boyfriend has a serious and adverse impact on their lives and "endangers their physical, mental, moral, or emotional health and that the harm likely to be caused by a change of environment is outweighed by the advantages to them." Ronald urges that Karla's continuous, open, meretricious conduct, within the home occupied by the children, places the children in a dangerous and harmful environment and that there exists an immediate and urgent need to withdraw them from it.

Ronald also contends that the evidence presented by him clearly discloses his ability to give the children a home life filled with affection, stability, guidance, understanding, and wholesomeness. He asserts that not only does the evidence submitted by him to the trial court meet the requirements of section 610(b)(3), but that the "best interests" of the children standards of section 602 of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 602) also have been met.

On the other hand, Karla contends that the evidence presented conclusively establishes that the children have been functioning at a high level of achievement, are doing well in school, have had affectionate and caring guidance and supervision, are physically and emotionally healthy, although admittedly the children are under some stress as a result of the custody proceeding. Karla emphasizes that the children are achievers in their school setting and are involved in happy peer activities. Additionally, the children were consulted and they approved of the established living arrangement, related well and freely to Karla's friend and to some degree considered him an affectionate father figure. Most important, Karla urges that the evidence presented utterly failed to disclose that the children, in the established environment, are having their physical, mental, moral, or emotional health endangered or harmed in any way. Additionally, Karla asserts, despite Ronald's denial, that Ronald's previously admitted goal in bringing the custody action was to wrench from her a substantial reduction in the support and alimony allowances and not really to force a change in custody in the interests of the children.

It is well settled in Illinois that the custodial provisions contained in a divorce judgment cannot be modified unless the evidence shows that a material change of circumstances relating to the best interests of the children has taken place. (*Vanderlaan v. Vanderlaan* (1972), 9 Ill. App. 3d 260, 292 N.E.2d 145.) The evidence must establish that the parent to whom custody of the children was originally awarded is unfit to retain custody or that a change of conditions, directly related to the needs of the children, makes a change of custody in their best interests. *Stickler v. Stickler* (1962), 38 Ill. App. 2d 191, 186 N.E.2d 542.

In all matters concerning the custody of the children, the paramount issue is their welfare. The fact of changed conditions, in itself, is not sufficient to warrant modification of the custody provisions of the decree absent a finding that such changed conditions affect the welfare of the children. The determination of whether a custody change should be effected is a matter within the discretion of the trial court who has heard the testimony of the witnesses, observed their demeanor, evaluated their credibility and weighed all of the evidence. (*Savre v. Savre* (1978), 61 Ill. App. 3d 11, 377 N.E.2d 850.) Further, the discretion given to the trial court in matters of children's custody is tempered by the desire for finality in custody judgments and a presumption in favor of the current custodian. (*In re Custody of Harne* (1970), 77 Ill. 2d 414, 396 N.E.2d 499.) Thus, the person seeking a change of custody must demonstrate that a change clearly is necessary for the welfare and best interests of the children. (*King v. Vancil* (1975), 34 Ill. App. 3d 831, 341 N.E.2d 65.) Also, the trial court's determination of custody will not be reversed unless there has been a clear abuse of discretion or the decision was contrary to the

manifest weight of the evidence. *Caulkins v. Caulkins* (1979), 68 Ill. App. 3d 284, 385 N.E.2d 1117.

The original custody award of the then four minor children was granted to Karla with the explicit written accord of Ronald set forth in the marital settlement agreement later submitted to the court for its approval and incorporated in the final decree. Embraced within the award of custody was an acknowledgement by Ronald of the fitness of Karla to be the custodial parent. Conceded was that Karla ostensibly had the necessary qualities of mind, character, and the physical health necessary and required to give the minor children the care, supervision, and direction that they needed.

While a peripheral attack as to the fitness of Karla to continue as the custodial parent is asserted by Ronald, the force of his assault centers on the alleged adverse consequences that may befall the children because Karla is living with her male, married friend within the home. He strongly urges that the life style adopted by Karla inextricably envelopes the children's lives to their detriment; and to the extent they remain exposed to that environment, they will be endangered or harmed in their physical, mental, moral, or emotional well-being. Having established the existence of the dangerous or harmful environment referred to in section 610(b)(3) of the Act, and having established that he can provide the children with a proper home and required supervision and care, Ronald claims that he has met his burden and that the custody of the children should be turned over to him. It is his claim that he is not required to produce affirmative proof that the environment established by Karla necessarily affects the best interests of the children in a specifically delineated adverse manner.

As previously noted, Ronald's chief reliance in support of his position is centered on the decision of our supreme court in *Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, 400 N.E.2d 421, *cert. denied* (1980), ___ U.S. ___, 66 L. Ed. 2d 155, 101 S. Ct. 329. In that case the mother, under the terms of the divorce decree, was granted the custody of the three minor children, 12, 10, and 7 years old at that time. Seven months after the entry of the decree, the father petitioned for custody contending that within two months after the divorce, the mother allowed her male friend to move into her home where the children resided with her. It was further charged that the mother and boyfriend lived together openly and notoriously and in a conjugal relationship. While expressing her love for her friend and his love for her, the mother and friend did not plan to marry but did intend to continue living together. A warm relationship existed between the mother's friend and the minor children. The father contended that the living arrangement created an improper moral environment unsuitable for the children. The father acknowledged that the children were always clean, healthy, well-dressed and well-nourished. He also said that the eldest of

the children, when asked, expressed no objection to the living arrangement.

The circuit court found that it was "necessary for the moral and spiritual well-being and development" of the children that the father receive custody. In reversing the trial court, the appellate court reasoned that the record did not reveal any negative effects on the children caused by the mother's cohabitation with her male friend, and that the circuit court had not found the mother unfit. The appellate court declined to consider potential future harmful effects of the cohabitation on the children.

In reversing the appellate court and reinstating the order of the circuit court which transferred custody to the father, the supreme court noted that although prior Illinois decisions did not always formally and explicitly articulate the specific requirements of the new Marriage and Dissolution of Marriage Act in determining the issue of custody, nevertheless, the law has always reflected and embodied the standards and requirements set forth in the new statute. Thus, it was clearly established that no change in custody be ordered unless the possible harm inherent in any change in custody is outweighed by the advantages to the children to be gained through the new setting and environment in which they would be placed. Also, the courts have always recognized that continuity and stability in the children's environment is, in itself, of significant importance and the custodial environment should be changed only where the conditions clearly warrant such change. *Bergan v. Bergan* (1976), 42 Ill. App. 3d 740, 356 N.E.2d 673; *Holloway v. Holloway* (1973), 10 Ill. App. 3d 662, 294 N.E.2d 759.

Ronald, pointing to *Jarrett*, urges that Karla's placing the children in the environment created by her, unalterably led to what "was injurious to the moral well-being and development of the children." Ronald directs attention to the language used by the supreme court in *Jarrett*:

"At the time of this hearing, however, and even when this case was argued orally to this court, Jacqueline continued to cohabit with Wayne Hammon and had done nothing to indicate that this relationship would not continue in the future. Thus the moral values which Jacqueline currently represents to her children, and those which she may be expected to portray to them in the future, contravene statutorily declared standards of conduct and endanger the children's moral development." (78 Ill. 2d 337, 347-48, 400 N.E.2d 421, 425.)

"Since the evidence indicated that Jacqueline had not terminated the troublesome relationship and would probably continue it in the future, the trial court transferred custody to Walter Jarrett, an equally caring and affectionate parent whose conduct did not

contravene the standards established by the General Assembly and earlier judicial decisions." (78 Ill. 2d 337, 350, 400 N.E.2d 421, 426.) Ronald thereby concludes that the same type of misconduct on the part of Karla in the case now before this court compels an automatic transfer of custody of the children to him.

In response to the allegation by Karla that there has been no showing that as a result of her life style the children have been harmed in any tangible way, Ronald again finds support in *Jarrett* where the supreme court stated:

"In some cases, particularly those involving physical harm, it may be appropriate for the trial court to determine whether the child is endangered by considering evidence of actual harm. In cases such as this one, however, such a narrow interpretation of the statute would defeat its purpose. At the time of the hearing the three Jarrett children, who were then 12, 10 and 7 years old, were obviously incapable of emulating their mother's moral indiscretions. To wait until later years to determine whether Jacqueline had inculcated her moral values in the children would be to await a demonstration that the very harm which the statute [IMDMA] seeks to avoid had occurred. Measures to safeguard the moral well-being of children, whose lives have already been disrupted by the divorce of their parents, cannot have been intended to be delayed until there are tangible manifestations of damage to their character.

While our comments have focused upon the moral hazards, we are not convinced that open cohabitation does not also affect the mental and emotional health of the children. Jacqueline's testimony at the hearing indicated that when her children originally learned that Wayne Hammon would move in with them, they initially expected that she would marry him. It is difficult to predict what psychological effects or problems may later develop from their efforts to overcome the disparity between their concepts of propriety and their mother's conduct. [Citation.] Nor will their attempts to adjust to this new environment occur in a vacuum. Jacqueline's domestic arrangements are known to her neighbors and their children; testimony at the hearing indicated that Wayne Hammon played with the Jarrett children and their friends at the Jarrett home and also engaged in other activities with them. If the Jarrett children remained in that situation, they might well be compelled to try to explain Hammon's presence to their friends and, perhaps, to endure their taunts and jibes. In a case such as this the trial judge must also weigh those imponderables, and he is not limited to examining the children for current physical

manifestations of emotional or mental difficulties." 78 Ill. 2d 337, 348-350, 400 N.E.2d 421, 425-26.

■■ We believe, however, that on close analysis, coupled with the reading of the full text of the opinion, the foregoing language contained in *Jarrett* is not to be interpreted in as absolute a manner as Ronald would have us do. We believe the direction of *Jarrett* (unlike the assertion found in the dissenting opinion concluding that a *per se* rule has been established),[3] is that the individual facts of each case must be evaluated in the context of the totality of all of the evidence presented on the issue of custody and that no individual fact necessarily is determinative. (See *In re Custody of Boyer* (1980), 83 Ill. App. 3d 52, 403 N.E.2d 796.) It is apparent that the evidentiary ingredients in a custody dispute, by the very nature of the contest and the individuality of the disputants are, indeed, numerous, varied, and interrelated and thus each factor must be weighed and considered in its relationship to all of the others shown to exist.

We note that the *Jarrett* court looked to the trial court's use of its broad discretionary powers in determining the custody issue. So too, the supreme court in *Jarrett* noted that the trial court's decision was reversible if, indeed, the trial court abused its discretion or ruled contrary to the manifest weight of the evidence and contrary to established legal principles. All of the foregoing point to the conclusion that the supreme court's determination of the custody issue was not resolved on a *per se* basis stemming alone from the *Jarrett* living arrangement.

We also note that the supreme court in *Jarrett* stated:

"The chief issue in this case is whether a change of custody predicated upon the open and continuing cohabitation of the custodial parent with a member of the opposite sex is *contrary to the manifest weight of the evidence* in the absence of any tangible evidence of contemporaneous adverse effect upon the minor children. *Considering the principles previously enunciated, and the statutory provisions, and prior decisions of the courts of this State,* we conclude that *under the facts in this case* the trial court properly transferred custody of the Jarrett children from [the mother] to [the father]." (Emphasis added.) 78 Ill. 2d 337, 345, 400 N.E.2d 421, 423.

---

[3] The dissent of Chief Justice Goldenhersh with whom Justice Moran joined in *Jarrett* contains the following language: "An examination of the opinion fails to reveal any other issue, and the effect of the decision is that the plaintiff's cohabitation with Hammon *per se* was sufficient grounds for changing the custody order previously entered." 78 Ill. 2d 337, 351, 400 N.E.2d 421, 426.

The separate dissent of Justice Moran, with whom Chief Justice Goldenhersh joined, contains the following language: "My primary disagreement with the majority lies with its countenancing a change of custody based solely on a *conclusive presumption* that harm to the Jarrett children stemmed from Jacqueline's arrangements." 78 Ill. 2d 337, 352, 400 N.E.2d 421, 427.

■■ It appears to us that the foregoing language used by the supreme court in *Jarrett* indicates that a decision directing a change of custody must be buttressed on more than the fact that the custodial parent resides with a member of the opposite sex in an open and continuing cohabitation. A decision on the issue of custody includes the evaluation of the totality of the evidence submitted along with a consideration of the elements and principles enunciated in prior decisions of the courts of Illinois and the relevant statutory provisions such as those found in sections 602 and 610 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, pars. 602, 610). Thus, we necessarily conclude that the circumstances of "living together" does not, *per se*, lead to the conclusion that the trial court must, for that reason alone, order a transfer of custody.

The foregoing is not to say that the conduct of Karla does not affront public morality, even if such conduct may no longer be seen as shocking or unusual in our contemporary society. In fact, the pronouncement of the purpose of the Illinois Marriage and Dissolution of Marriage Act is to "strengthen and preserve the integrity of marriage and safeguard family relationships" (Ill. Rev. Stat. 1977, ch. 40, par. 102(2)), and not to applaud and encourage the life style of Karla. Nevertheless, the affront to public morality as practiced by Karla was only an additional element to be considered by the trial court in making its decision as to the best interests of the children and as to whom their custody should be awarded.

Here too, just as was the case in *Jarrett*, it was incumbent on the trial court to recognize that Karla's disregard for existing standards of conduct instructs her children, by example, that they too may disregard those standards. Such conduct on the part of Karla could well encourage the children to engage in similar activity in the future. As noted in *Gehn v. Gehn* (1977), 51 Ill. App. 3d 946, 949, 367 N.E.2d 508, 511:

> "The effects may well be subjective ones that will raise their ugly heads and make their presence known at some future time. Certainly the conduct of the plaintiff cannot be regarded as good and wholesome moral training."

(See also *De Franco v. De Franco* (1978), 67 Ill. App. 3d 760, 384 N.E.2d 997.) The record discloses that the trial court seriously considered and evaluated these troublesome and important aspects of the custody issue. Nevertheless, having considered these particular matters, the trial court was not compelled to direct a change in custody if other evidence coupled with the court's use of its discretionary powers warranted otherwise.

It is true, as Karla argues, that Illinois courts have often allowed women whose behavior society may have considered to be questionable to retain custody of their children or have refused to change custody in the absence of any evidence that the "imprudence" was detrimental to the

child's welfare. (See *Nye v. Nye* (1952), 411 Ill. 408, 105 N.E.2d 300; *Eaton v. Eaton* (1977), 50 Ill. App. 3d 306, 365 N.E.2d 647; *Hendrickson v. Hendrickson* (1977), 49 Ill. App. 3d 160, 364 N.E.2d 566; *Christensen v. Christensen* (1975), 31 Ill. App. 3d 1041, 335 N.E.2d 581; *Collings v. Collings* (1970), 120 Ill. App. 2d 125, 256 N.E.2d 108; *Arden v. Arden* (1960), 25 Ill. App. 2d 181, 166 N.E.2d 111.) We also are aware that the Marriage and Dissolution of Marriage Act provides that in determining custody in accordance with the best interests of the child, "[t]he court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child." (Ill. Rev. Stat. 1979, ch. 40, par. 602(b).) It thus appears that by statutory mandate, it is not the trial court's function to approve or disapprove Karla's conduct, but only to determine its effect upon the children. Thus, the trial court was compelled to, and indeed, did consider the fact that Karla persisted in continuing the "living arrangement" indefinitely and offered to have her male friend leave the residence only on the order or suggestion of the trial court—a role that the trial court quite properly refused to undertake. Again, the record discloses that the trial court was keenly aware of Karla's stand with reference to her continued residence with her male friend and the probable effect of such conduct on the minor children. It is apparent that the trial court considered the foregoing, along with all other evidentiary matters touching on the children's welfare, in coming to its ultimate decision on the issue of custody.

*Sandra's custody*

The record in this proceeding clearly indicates the care and concern with which the trial court sought to arrive at a determination of the custody issue that would inure to the greatest benefit and best interests of the children. The evidence, including that disclosed through the case worker's investigative report, showed that Sandra, now 16, is a mature, stable, discerning young woman of high intellect and sensibility. Sandra was forthright in describing the negative relationship that exists between her and her father. She explained her reasons for her attitude. She felt deep resentment towards her stepmother and her children. She expressed deep love and regard for her mother and told of their closeness and mutual dependency. She gets along well with her mother's friend. Sandra indicated a strong desire to remain in the custody of her mother.

The trial court found Sandra to be comfortable, happy and secure within her present environment. Except for the nature of Karla's living arrangement with her male friend, no suggestion is found in the evidence that the custody of Sandra should be altered. Considering the age and maturity of Sandra, the length of time she has been within her present environment, and the quality of her relationship with her mother, and

coupling these factors with the broad discretion available to the trial court in determining the issue of custody, and the trial court's consideration of all of the statutory factors involved, we cannot say that the trial court erred in its ruling. Accordingly, we do not find a basis to declare that the trial court abused its discretion or ruled in a manner contrary to the manifest weight of the evidence in denying a transfer of Sandra's custody to her father.

### Kimberly's custody

Kimberly's situation is quite different from Sandra's. As previously noted, the trial court's initial *in camera* conference with Kimberly coupled with the other evidence presented led to the trial court's order of July 29, 1980, that the change of custody sought by Ronald be denied. Within a month following the entry of that order, Ronald sought its vacation and again asked for the custody of Kimberly. It was asserted that Kimberly had become emotionally distraught and that now she earnestly urged that she be placed in the custody of her father.

The trial court, with skill and sensitivity, sought to determine the reasons for the abrupt change in Kimberly's former expressed desire to remain in the custody of her mother and why she now desired to reside with her father.

It became evident to the trial court that Kimberly, despite an earlier declaration to the contrary, was now strongly inclined to live with her father and his new family. It was apparent to the trial court that Kimberly was emotionally upset and agitated. She now held a degree of serious hostility towards her mother which impaired her ability to function at an adequate and comfortable level. The trial court directed that Kimberly receive professional counselling and assistance subject to the supervision of the trial court. An appropriate order was entered in that respect. It was the further determination of the trial court that Kimberly reside, albeit on a temporary basis, with her father.

■■ The record unmistakably discloses that the trial court's judgment in ordering counselling for Kimberly and in ordering Kimberly into the "temporary custody" of Ronald was in the first instance the proper judgment to make. Kimberly has responded in an excellent manner. The evidence shows that Kimberly is doing exceptionally well in school, is happy and outgoing in her present environment, relates well to all the members of her father's household and is functioning on a high level of accomplishment. Since residing with her father, Kimberly's relationship with her mother has improved markedly and regular visitation contact is maintained. Additionally, Kimberly remains steadfast in her desire to remain in the custody of her father. It is obvious that Kimberly now has a

degree of stability and security that she lacked at the time of the initial *in camera* conference. It seems clear that considering all factors involved, it would greatly add to Kimberly's feelings of security and self-worth that her custody remain with her father. Another change in Kimberly's custody, even though it be from the interim custodial arrangement, can do no more than create additional psychological problems for the child who is now 15 years old. We also observe that the very nature of the living arrangement of the child's mother and the mother's married male friend (unlike the situation with Sandra) might reasonably be expected to compound any problems of insecurity still retained by Kimberly.

Accordingly, based on our review of the evidence and considering the applicable principles and statutory factors involved in change of custody proceedings, we conclude that the best interests of Kimberly dictate that her custody be transferred to Ronald subject to the establishment of a wholesome program of visitation and contact with Karla.

While we are mindful of the superior position of the able trial court to observe the witnesses and evaluate their testimony, and to apply the statutory standards, nonetheless, after careful examination of the record, we are compelled to conclude that the trial court should have allowed the change of Kimberly's custody to Ronald. We are also aware of the doctrine that children of divorced parents should not be divided in their custodial arrangement absent compelling circumstances. (See *In re Marriage of Lovejoy* (1980), 84 Ill. App. 3d 53, 404 N.E.2d 1092; *Mikrut v. Mikrut* (1969), 113 Ill. App. 2d 446, 251 N.E.2d 84.) We believe that the evidence in this case warrants the custodial arrangement directed by us.

## II

*Claimed Arrearages*

Ronald claims that the trial court erred in ordering him to pay $3100 allegedly due in connection with the award of unallocated alimony and support for the children.

The divorce decree entered on September 20, 1977, required Ronald to pay Karla the sum of $800 per month as unallocated alimony and support for the four minor children awarded into her custody. Thereafter, on September 29, 1977, the eldest child, Tammy, having become emancipated, the parties by written agreement, but without the entry of a court order, reduced the monthly amount to be paid by Ronald to $700. Despite the fact that the child, Ronald Mark, began residing with Ronald in December 1977, and was in his actual custody for all intents and purposes, Ronald continued to pay allowances of $700 per month to Karla.

On September 27, 1979, Ronald filed his petition seeking a change in custody and requesting a reduction in the allowances to be paid by him.

At that point in time the two minor children, Sandra and Kimberly along with Karla's male friend resided in the marital residence which had been awarded to Karla.

Ronald continued to pay Karla the sum of $700 per month and then, on December 1, 1979, Ronald, unilaterally and over Karla's objection and prior to the entry of any order of court granting him leave to so do, reduced the allowances to $400 per month.

On January 11, 1980, Karla filed her petition seeking to enforce the payments of the allowances on the $700 per month level. It was not until November 21, 1980, that the trial court, having concluded the evidentiary hearings regarding the claimed arrearages, the requested reduction in the allowances, and the financial positions of the respective parties, ruled on the contested financial issues. The trial court's order of November 21, 1980, directed Ronald to pay Karla what the trial court found to be an accumulated arrearage of $3100.[4] This amount was to be paid within six months. The support for Sandra, the only child then living with Karla was set at $300 per month, and in view of Karla's living arrangement with her friend, allowances for Karla were suspended. The order further provided that upon Kimberly's renewing residence with Karla, the trial court would re-evaluate the support allowances to be paid to Karla.

Ronald contends that based upon the facts and circumstances presented to the trial court, it was unfairly burdensome to compel him to pay $700 per month as allowances when only the two minor girls were residing with Karla between December 1979 and November 1980. Ronald asserts that by paying $700 per month up to December 1979 he has actually overpaid in view of the fact that his son, Ronald Mark, has resided with him and has been supported by him totally since December 1977. We disagree with Ronald's contention.

■■■ It is well settled that a party may not unilaterally reduce allowances on the basis of a claimed change in circumstances. Modification is considered a judicial function which is to be administered by the court in its discretion. (*Jozwick v. Jozwick* (1979), 72 Ill. App. 3d 17, 390 N.E.2d 488.) While agreeing with the foregoing principle, Ronald argues that there is no vested right to allowances accruing after a petition for modification is filed, and he filed such a petition as far back as September 27, 1979. (See *In re Marriage of Junge* (1979), 73 Ill. App. 3d 767, 392 N.E.2d 313; Ill. Rev. Stat. 1979, ch. 40, par. 510(a).) He urges that the modification order be effective as of the time he filed his petition seeking reduction in the amount of the allowances. However, whether a modifi-

---

[4] The arrearage sum of $3100 reflects an accumulation of $300 per month from December 1979 to November 1980 during which period Ronald paid Karla $400 per month rather than $700 per month. It also reflects a credit of $200 paid to Karla by Ronald pursuant to the trial court's order of January 11, 1980.

cation is to be retroactive to the date of the filing of the petition, or any time after, is a matter within the trial court's discretion. (*In re Marriage of McDavid* (1981), 97 Ill. App. 3d 1044, 425 N.E.2d 442.) The record discloses the submission of an abundance of financial data reflecting the financial and economic situation of both parties and the substantial wealth, real estate holdings and income of Ronald. There is no assertion by Ronald that the trial court abused its discretion in any specific manner in determining the amount due from Ronald up to the time of modification by the trial court's order of November 21, 1980. Nor does Ronald question the fact that the trial court failed to consider any relevant evidence in reaching its conclusion or that he is financially unable to pay the amount ordered by the trial court.

It appears that Ronald made the payments of $700 per month until December 1, 1979, on the basis of his personal assessment and in line with his known financial condition. Having voluntarily made the payments of $700 per month despite his son's residing with him, Ronald cannot now claim some financial reward on the premise that, had he filed a petition seeking a reduction in the amount he was to pay, a reduction would have been granted. It is our conclusion that the trial court's ruling is supported by the record and indicates a proper exercise of the trial court's discretion.

### III

*Attorneys Fees*

Ronald's final contention is that the trial court erred in awarding $3000 to Karla's attorneys. It is his sole position that the instant litigation was compelled because of Karla's misconduct in taking up residence on an open, conjugal basis with her married male friend. Ronald claims that to protect the best interests and welfare of the minor children he was forced to proceed with this action; and Karla being the actual instigator of the court proceedings, that she alone should be required to pay her attorneys fees. Ronald makes no claim questioning the reasonableness of the award, his ability to pay it or the inability of Karla to pay any portion of the award. We disagree with Ronald's view of the nature of this litigation and considering our decision in this case, we find Ronald's characterization of this action inaccurate.

We are aware that where a party upon whom fees are sought to be imposed has done nothing which necessitated or required judicial action, the allowance of fees has been held to be error. (*Kuhns v. Kuhns* (1972), 7 Ill. App. 3d 884, 288 N.E.2d 884.) This is not to say that in all cases an unsuccessful party in a post-decree proceeding is precluded from an award of attorneys fees. (*Cf. Robin v. Robin* (1977), 45 Ill. App. 3d 365, 372-73, 359 N.E.2d 809, 814.) The ultimate determination as to whether there will be a fee award lies in the trial court's exercise of its discretionary

powers. While it is true that the trial court will seriously consider the circumstances leading to the initiation of the judicial proceedings, it will also consider all other factors involved. The allowance of attorneys fees in the post-decree modification proceedings resting in the sound discretion of the trial court, the trial court's decision will not be disturbed on review except where it appears that the exercise of that discretion is clearly abused. We do not find an abuse of the trial court's discretion in making the fee award in this case.

We note that the record discloses that prior to the time of Ronald filing his custody petition, he and Karla were involved in serious disagreement as to the amount of the allowance that was to be paid by Ronald. Both parties indicated probable litigation over that matter. In fact, the subsequent litigation concerned itself to a substantial degree in resolving that very issue. Both parties took positions which they felt were meritorious, and the legal action did not involve any type of legal harassment.

We also observe that the important issue of determining custody of the two minor children was seriously pursued by both parties. Considering the totality of the evidence presented, it would be an oversimplification of the proceedings to conclude that the ensuing litigation was brought about through the fault of Karla alone and that Ronald's conduct did not contribute to its need. We also note that the trial court expressed its belief that Ronald's motive in filing the custody petition may have stemmed from Ronald's financial concerns rather than his concern with the welfare and best interests of the minor children.

Finally, the decision to which we come is in itself evidence of the legal merit of the issues raised by both parties and thus underscores the weakness of Ronald's contention that the attorneys fee award be set aside.

For the reasons set forth above:

1. We affirm the trial court's denial of the petition of Ronald Brandt seeking custody of the minor child, Sandra.

2. We reverse the trial court's denial of the petition of Ronald Brandt seeking custody of the minor child, Kimberly.

3. We affirm the trial court's orders relating to fixing the allowance arrearage due from Ronald Brandt in the sum of $3100 and the attorneys fees award to be paid by Ronald Brandt in the sum of $3000.

4. We remand for the trial court to set a proper visitation arrangement for the parties with the minor children and for the entry of such other orders as may be required to implement the provisions of this opinion.

Affirmed in part, reversed in part, and remanded for further proceedings.

JOHNSON and JIGANTI, JJ., concur.