*In re* MARRIAGE OF ROBIN R. JOHNSON, f/k/a Robin R. Sims, Petitioner-Appellant, and WAYNE C. SIMS, Respondent-Appellee.

Third District   No. 3—91—0908

Opinion filed June 4, 1993.

SLATER, J., specially concurring.
STOUDER, J., dissenting.

Olivero & Olivero, of Peru (Lisa Olivero, of counsel), for appellant.

Trimble, Angel, Isaacson & Tracy, of Princeton (Daniel F. Tracy, of counsel), for appellee.

JUSTICE BARRY delivered the opinion of the court:

Robin Johnson, formerly Robin Sims, appeals from an order of the circuit court of Bureau County terminating joint custody and transferring physical custody to Wayne Sims, the father of the children. On appeal, Robin argues that the trial court's order was against the manifest weight of the evidence and an abuse of discretion in that the findings of the court did not satisfy the requirements of section 610 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1989, ch. 40, par. 610).

Robin and Wayne were married on April 16, 1977. Three sons were born of the marriage: Billy on July 25, 1977; Donald (Donnie) on November 19, 1980; and Timothy (Timmy) on October 18, 1982. The parties were granted a divorce on October 30, 1989. The judgment of

dissolution incorporated a separation agreement entered into by the parties. The agreement included a provision that the parties would have joint custody of the children with Robin having physical custody and Wayne having liberal visitation. Because Robin had trouble disciplining the oldest child, Billy, the parties in October of 1990 agreed that Billy would live with Wayne.

After the divorce, Robin continued to live in the marital home in Tiskilwa, Illinois, with the children. She was employed as the head teller at a bank in Princeton, Illinois. At first Wayne lived in the basement of his grandfather's home in Princeton but moved into a house about four miles outside of Tiskilwa prior to the hearing in this cause. Wayne was self-employed in the lawn care business in Princeton.

Both parties testified that they had not been able to get along since the divorce. Many of their fights concerned who would have the children on certain days. Because they often could not agree, they set up a specific schedule for visitation which divided actual custody evenly between the two parents.

The parties also testified regarding an incident on February 6, 1991. The boys helped Wayne in his lawn care business, and he in turn compensated them for their work. On the day in question, Wayne left Timmy's W-2 form in Robin's van while she was at work, a customary means of delivering things to Robin. Robin testified that she had already filed her tax return by that date and was concerned that Timmy's W-2 showing $700 income would cause trouble with the Internal Revenue Service (IRS) because she had taken Timmy as a dependent. That evening Robin called Wayne's home twice and left extremely angry, threatening and vulgar messages, one relating to her IRS concerns and the other concerning an encounter with someone she described as "your little sleaze." Because Billy was living with Wayne at that time, he had access to these telephone messages filled with profanity and vulgarities.

The most serious incident occurred on February 12, 1991. According to Wayne, Robin left a message on Wayne's answering machine on February 10 asking if he could watch the boys on February 12 when they had no school but she had to work. Wayne called her and suggested that she drop the boys at his shop in Princeton where he would be working that day and that she pick them up there after work. When she had not arrived to pick them up by shortly after 6 p.m., Donnie called her home in Tiskilwa and left a message on her answering machine. She called back and demanded that Wayne bring the boys to her home. Wayne said he had work to do and would not be able to bring the boys home until later; if she wanted them right

away, she would have to come for them. She began to swear and argue and call him names until he hung up on her. He prepared some food for the boys' supper and then received another call from Robin demanding that he bring the boys to her at once. Again he said that he would do so "in a couple of hours" when he had finished the work he was doing, and he again hung up.

According to Robin, she then changed her clothes, got her gun (a small caliber pistol) and the clip for the gun from their separate storage places, and with the gun and clip under the seat of her van, she drove from Tiskilwa to Princeton, a trip of 15 to 20 minutes. When she arrived, she parked a little more than 10 feet from the garage door type entrance to the shop. At that time she put the clip in the gun, put the gun in her right-hand coat pocket, and went into the shop. Her account reveals a carefully premeditated plan of action to approach Wayne with a loaded gun in order to make him listen to her.

She went into the shop through the nine-foot-wide garage door and told Donnie and Timmy to go out and get in the van. She told Billy "to just get the fuck out." The boys left, and Robin began to swear and argue about her understanding that Wayne would bring the boys to Tiskilwa after she had finished work at 6 p.m. Wayne said he had told her to pick them up at his shop, where she had dropped them off. After Robin told him he was going to listen to her, he asked her to take the boys and go home because he had work to do and didn't want to listen to her. She then tried to slap him, and he opened the garage door and pushed her a couple steps outside. Although it was dark outdoors, she was standing in the area lit by the light shining out through the door.

According to Wayne's testimony at trial, Robin took the pistol from her coat pocket, pointed it at him and pulled the trigger. She kept trying to fire the gun and moved the action back and forth to put a shell in the chamber. The gun still did not fire because the safety was on. When she looked down at the gun, Wayne jumped her and pushed her to the ground. While on the ground, she attempted to point the gun at him over her shoulder. He managed to get the gun and pushed it away from her while he sat on her back.

Robin had her back to the van when she first pointed the gun at Wayne. Wayne testified that the boys were screaming and crying inside the van. Wayne called to them to go into his mother's house, which was next door to the shop, and to call the police. The boys' crying and screaming indicated that they were frightened by the fight taking place a few feet from them.

Robin continued to yell, swear, bite, and kick. She managed to reach the gun a second time, and Wayne was able to kick it away. He finally quieted her down by putting a handkerchief in her mouth for a couple of minutes. At that point, Billy called from inside the house asking whether everything was all right. Because Robin had gone for the gun a second time, Wayne thought it necessary to tie her hands, and so he asked Billy to bring some tie straps. However, the police arrived and handcuffed Robin before Wayne had a chance to tie her. Thus, a potentially tragic situation ended without injury to anyone.

According to Robin, she brought the gun with her because she felt this was the only way she could get Wayne to listen to her. She stated that she was still upset about the W-2 incident and that whenever she tried to talk to Wayne, he refused to listen to her. She testified that she never attempted to pull the trigger but only wanted to frighten him.

As pointed out in the dissenting opinion, Wayne's statement to the police on the night of the gun incident did not mention that Robin had tried to pull the trigger, and the trial court made no finding as to whether Robin attempted to shoot the gun. However, at the time the trial court denied Robin's motion to reconsider, the trial court made the following comments: "[T]here was an attempt murder because there was evidence that she was actually working the slide on the gun and he [Wayne] saw that the safety was on and got it away from her and the children, of course, had to see what transpired following that on the ground. They did get to see that and they heard the sounds." Obviously, the trial court considered Wayne's trial testimony to be credible.

On February 20, 1991, Wayne filed a petition to change custody, and a hearing was held in September of 1991. At the conclusion of the hearing, Wayne was granted sole custody of the three boys and Robin received visitation every other weekend. Robin has appealed.

Because the petition to change custody was filed within two years after the judgment for dissolution of marriage, the court was required to find that the requirements of section 610 of the Act had been satisfied. Section 610 provides in part:

"Modification. (a) Unless by stipulation of the parties, no motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health.

(b) The court shall not modify a prior custody judgment unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of the entry of the prior judgment, that a change has occurred in the circumstances of the child or either or both parties having custody, and that the modification is necessary to serve the best interest of the child. *** The court shall state in its decision specific findings of fact in support of its modification or termination of joint custody if either parent opposes the modification or termination." Ill. Rev. Stat. 1989, ch. 40, pars. 610(a), (b).

■ Since Wayne's petition to modify custody was filed less than two years after the original custody judgment, he had to comply with the requirements of section 610(a). The policy of section 610(b) has been held to favor the finality of custody judgments and to make modifications more difficult. (*In re Marriage of Burke* (1989), 185 Ill. App. 3d 253, 541 N.E.2d 245.) The effect of this section is to create a legislative presumption in favor of the present custodian, thus promoting the continuity and stability of the child's custodial and environmental relationship which is not to be overturned lightly. *In re Marriage of Kramer* (1991), 211 Ill. App. 3d 401, 507 N.E.2d 422.

The standard of review in a case where the trial court orders a change in custody was held by the Illinois Supreme Court to be as follows:

"Once the court concludes that a change in custody is necessary, great deference must be accorded that decision, since the trial court is in the best position to judge the credibility of the witnesses and determine the needs of the child." *In re Custody of Sussenbach* (1985), 108 Ill. 2d 489, 499, 485 N.E.2d 367.

*In re Marriage of Spangler* (1984), 124 Ill. App. 3d 1023, 1028, 464 N.E.2d 1120.

As we consider whether the judgment of the trial court is against the manifest weight of the evidence, we are required to view the evidence in the light most favorable to the appellee (Wayne). (*Treadwell v. Downey* (1991), 209 Ill. App. 3d 999.) Thus, we cannot disregard Wayne's version of the shooting incident and other events, as the dissent would have us do, but instead must consider that his testimony supported the findings of the trial court. Those findings were as follows:

(1) Wayne Sims "has proven by clear and convincing evidence, based on facts that have arisen since the prior judgment, that a

change has occurred in the circumstances of the minor children of the parties and their parents."

(2) This change in circumstances "constitutes a serious endangerment to the physical, mental, moral and emotional health of the children."

(3) These changes are as follows: (a) Robin Johnson "experiences immediate and uncontrollable anger when things go wrong"; (b) Robin "demonstrated her immediate and uncontrollable anger" in a telephone message which was recorded with her knowledge; (c) Another example of Robin's immediate and uncontrollable anger occurred when she threatened Wayne "with a gun that had bullets in the clip while the children were present in the general area"; and (d) Robin has a violent temper which she has displayed on several occasions in the presence of both Wayne and her minor children.

(4) Wayne is a fit person to be granted custody of the minor children.

Further, upon denial of Robin's motion for reconsideration, the trial court said, "[Robin] almost responds with a child like hysteria, anger, and lashes out with violence on occasions."

In 'the case before us, the demeanor and attitude of the parties were critical to determining the credibility and character of the two parents. The court heard testimony from both parties describing Robin's strong animosity and her hostile reaction to Wayne which made plain that the joint custody order was not working and needed to be changed. It was for the trial court to determine which parent should be the custodial parent, and the choice was in favor of the father, who had exercised his visitation rights and had the boys at least six months of each year. Furthermore, at Robin's request, Billy, the oldest son, was living with Wayne all the time.

The circuit court's determination removed the Simses' children from a joint custody arrangement the court found had exposed them to a risk of physical and psychological harm resulting from Robin's explosive and violent encounters with Wayne. The court cogently expressed its genuine concern for the welfare of these boys when the trial judge analyzed the evidence at the close of the hearing: "[I]f that gun had gone off, those children would be in a foster home because he [Wayne] would be in a coffin and she [Robin] would be in the penitentiary." The best interest of these children is well served by the change in custody.

The findings of the trial court are supported by ample evidence. In addition to the dispute on February 12, 1991, the testimony of both

parties related other hostile encounters and other difficulties involving the children. A brief summary of that evidence is necessary here.

Robin and Wayne agreed that there were numerous times after the divorce when Robin called Wayne because she was having problems with the boys and could not control the oldest son, Billy. Wayne would come to Robin's home, settle the boys down, and take whoever caused the dispute back home with him. Ultimately Robin decided she could not handle Billy, and in October of 1990, she sent him to live with Wayne.

During her testimony, Robin admitted that she loses her temper on occasion and uses swear words and that she often gets upset with Wayne. She also testified that she struck and bruised Billy with a yardstick one time and that she has slapped him in the face a couple of times with her hand to the point of hurting her hand. She stated that she has "probably" used the yardstick on Donnie as well, and that Wayne has warned her not to strike the boys again.

One night shortly after the divorce, Robin left the three boys alone about 1:30 a.m. and went from Tiskilwa to the home of Greta Pease in Princeton, where Wayne was helping move furniture. Robin began yelling and cursing and finally pushed Greta to the ground.

On another occasion during the spring of 1990, Robin came to Wayne's house on a day when he had the boys with him. She started to argue about how the boys' savings accounts were to be held, and when Wayne refused to allow her in his house, she proceeded to curse and pound on the windows demanding to be allowed to enter. Wayne testified that he sent the boys to the basement so that they would not be involved and then he called the Tiskilwa police.

These several incidents are more than sufficient to support the trial court's findings that the children were seriously endangered by Robin's uncontrollable anger and violent temper. It was not necessary to have evidence of poor school work or manifestations of specific psychological problems in order to find a serious endangerment to the physical, mental, moral and emotional health of the children. Repeated incidents of Robin's foul-mouthed shouting, swearing, and striking at the father in anger would likely affect the moral and emotional health of the children, even if not immediately evident. Although Robin contends that the children have suffered no adverse effect from her escalating hostility toward Wayne, the court need not wait until the harm is done before taking steps to reduce the parental conflict in the boys' lives by terminating the joint custody arrangement, which the trial court obviously found to be unworkable. *Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, 400 N.E.2d 421; *In re Marriage of*

*Padiak* (1981), 101 Ill. App. 3d 306, 427 N.E.2d 1372; *In re Custody of Nodot* (1980), 81 Ill. App. 3d 883, 401 N.E.2d 1189.

Furthermore, the record contains significant testimony of Robin's tendency to resort to physical violence with Billy and to a lesser extent with Donnie. Beating and bruising a child have been held sufficient to warrant a change in custody within two years of the previous custody award. (*In re Marriage of Eleopoulos* (1989), 186 Ill. App. 3d 374, 542 N.E.2d 505.) Robin has voluntarily given custody of Billy to Wayne, but the evidence that she struck both Billy and Donnie until warned by Wayne was supportive of the trial court's findings.

In addition, Robin argues that the finding of the trial court that there had been a change in circumstances was against the manifest weight of the evidence because the parties had been hostile before the divorce as well as afterward and, thus, their hostility was not a change. This position ignores the oral statement of the trial judge in announcing his decision:

> "The change that has occurred here is the children are now endangered. It's obvious that they are, maybe they weren't before, maybe they were and we just didn't know it. But *I'm finding they are endangered and that's a change.*" (Emphasis added.)

In other words, at the time the agreed order for joint custody was entered, the court had no knowledge that Robin's hostility toward Wayne endangered the well-being of her children, but now the court does have knowledge of numerous incidents occurring since the divorce. That justified a finding of a change in circumstances. Section 610(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1989, ch. 40, par. 610(b)) permits a custody modification upon clear and convincing evidence "of facts that have arisen since the prior judgment or *that were unknown to the court at the time of entry of the prior judgment,* that a change has occurred in the circumstances of the child, or his custodian." (Emphasis added.)

Section 610(b) also provides that a joint custody arrangement may be modified when "necessary to serve the best interest of the child." (Ill. Rev. Stat. 1989, ch. 40, par. 610(b).) Section 602(a)(6) of the Act lists the factors to be considered in determining the best interest of the child in custody disputes, including "(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person." (Ill. Rev. Stat. 1989, ch. 40, par. 602(a)(6).) The trial court properly weighed the evidence of Robin's proclivity towards physical violence in deciding to end the joint custody arrangement.

■ The record contains clear and convincing evidence to support the findings of the trial court that the joint custody arrangement seriously endangered the physical, mental, moral and emotional health of the children and that such endangerment was a change in circumstances occurring after the custody order was entered in 1989. Therefore, the requirements of section 610(a) are met in this case. The decision to end the joint custody arrangement and to award custody to one parent with clearly prescribed visitation for the other, in order to eliminate as many of the occasions for interaction between Wayne and Robin as possible, was shown by ample evidence to be in the best interest of the children. Further, the decision to award custody to Wayne was not an abuse of the great discretion entrusted to the trial court and will be affirmed.

The dissenting opinion appears to weigh the evidence, rather than to consider whether there is evidence to support the trial court's findings and judgment, and then reaches a conclusion that would result in the continuance of the joint custody that has provided so much fuel for the fire of Robin's anger and hostility. Obviously the prior arrangement that the parents had custody every other day should not be resumed.

We note that the dissent only accepts the testimony of Robin and emphasizes that Donnie and Timmy are bullied by Billy when they are with their father. Robin makes no such argument in this court. The evidence in the record indicates that the only time there were problems between the boys was when they were with their mother, who could not control Billy. Wayne testified that he had no trouble making the boys mind when they were with him. A reviewing court is not free to ignore evidence which supports the judgment of the trial court and to rely instead upon speculation in order to reverse.

■ Robin has also asserted additional trial errors as grounds for reversal. First, she argues that the trial judge's refusal to interview the minor children *in camera* as to their wishes was an abuse of discretion. Section 604(a) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1989, ch. 40, par. 604(a)) provides in part:

> "The court may interview the child in chambers to ascertain the child's wishes as to his custodian and as to visitation."

Illinois courts have repeatedly held that the matter of *in camera* interviews is within the discretion of the trial court. When the trial court determines that good reason exists not to conduct such an interview, a reviewing court will not substitute its judgment for that of the trial judge. (*In re Marriage of Stuckert* (1985), 138 Ill. App. 3d 788, 486 N.E.2d 395; *In re Marriage of Padiak* (1981), 101 Ill. App. 3d

306, 427 N.E.2d 1372.) Here the trial court stated that the probative value of what the boys might say would be far outweighed by the possible damage of requiring them to testify as to a choice between their parents. This determination was not an abuse of discretion.

The dissenting opinion emphasizes the mandatory nature of the section 602(a) requirement that the trial court consider the wishes of the child and concludes that the court erred in refusing to interview the boys. That argument was found unpersuasive in *People ex rel. Bukovic v. Smith* (1981), 98 Ill. App. 3d 144, 153, 423 N.E.2d 1302, where the court said:

> "It should be noted that the court's failure to interview the boys was not *** fatal to its determination of the boys' best interests. Although section 602 states that 'the wishes of the child as to his custodian' is a factor to be considered in determining the best interests of the child, there was sufficient doubt raised by the evidence as to the influence exerted on the boys by their grandfather for the court to conclude that an interview of the children would not be fruitful ***."

We also note that the reasoning of the dissent would render meaningless the language of section 604(a) which plainly vests discretion as to interviews of children with the trial court. *In re Marriage of Stuckert*, 138 Ill. App. 3d 788, 486 N.E.2d 395.

Robin also challenges trial court rulings which allowed Wayne to use certain evidence for impeachment purposes. Robin objects to the introduction of a letter received by Wayne from one of Billy's teachers saying that his school work had improved during the last two weeks. This letter was used during cross-examination of Robin after she stated that she had called the school and learned that Billy's grades were not improving after he began to live with his father. Robin now argues that the issue of Billy's grades was strictly a collateral matter since Billy's custody was not at issue, and therefore, the letter should not have been admissible.

■ Any error in allowing the teacher's letter to be used for cross-examination would not require reversal since it could not have affected the outcome of the case. (See *Bullard v. Barnes* (1983), 112 Ill. App. 3d 384.) As Robin admits, Wayne's custody of Billy is not in dispute; thus, any error as to testimony relating to him would be harmless.

■ Robin further contends that the court erred in allowing Wayne's counsel to cross-examine her on the basis of a police report concerning the events of February 12, 1991. She argues that counsel did not lay a proper foundation for using the report for impeachment

and that the report constituted inadmissible hearsay evidence. The record indicates that Robin testified that the report was an accurate account of her statement to the police. In view of the other testimony before the trial court recounting the events of February 12, any error as to use of the report for impeachment was harmless.

The judgment of the circuit court of Bureau County is affirmed.

Affirmed.

JUSTICE SLATER, specially concurring:

As this case illustrates, custody determinations are often extraordinarily difficult to make. While the primary concern of the courts must always be the best interests of the children, those interests are ill-served when parents are unwilling or unable to resolve their differences without anger and threats of violence. Sadly, the "best" interests of the children too often means "the best we can do" under the circumstances.

I do not know whether Donnie and Timmy will ultimately be happier and healthier because their father has custody rather than their mother. I do not know, if I had been the trial judge, which version of the facts presented I would have believed. It is not, however, this court's function to conduct *de novo* review. "[T]he question for the reviewing court is whether the trial court's decision is contrary to the manifest weight of the evidence." (*In re Custody of Sussenbach* (1985), 108 Ill. 2d 489, 499, 485 N.E.2d 367, 371.) Under the facts presented here, I am compelled to conclude that the court's findings are sufficiently supported by the evidence.

JUSTICE STOUDER, dissenting:

I do not agree with the majority that the findings of the circuit court were supported by the evidence. In my opinion, those findings were against the manifest weight of the evidence and the judgment of the circuit court should be reversed.

Initially, I find it necessary to discuss a factual question that is not made clear in the majority opinion. The record contains three versions of the gun incident of February 12, 1991. Robin testified that she never intended to shoot Wayne and that she only took the gun along because she believed that it was the only way that she could make Wayne listen to her. She testified that she never attempted to discharge the pistol. The second version of the incident is contained in a detailed, written, three-page statement that Wayne gave to the police on the night of this incident. In this statement Wayne stated that

Robin pointed the gun at him and he knocked it out of her hand. Nowhere did he state that she attempted to shoot the gun. The third version of the incident is Wayne's testimony at the custody hearing, wherein he stated that Robin repeatedly tried to discharge the weapon. The record clearly shows that Wayne did not claim that Robin tried to shoot him until he decided that he wanted custody. The trial court apparently accepted Robin's version, because the final order contained a finding that Robin threatened Wayne with a gun but no finding that she tried to shoot him. Unlike the majority, I see no relevance in the fact that the trial judge later improperly characterized the incident as attempted murder. I prefer to rely on the findings the trial court made after hearing all of the evidence, not on an off-hand remark the trial judge made two weeks later in deciding a motion for reconsideration.

On the merits of the case, the petition to change custody was filed within two years after the judgment for dissolution of marriage, so the court had to find that the requirements of section 610 of the Act had been satisfied. Wayne complied with the affidavit requirement of section 610(a) of the Act and therefore was required to prove by clear and convincing evidence that a change had occurred in the circumstances of the children or either or both parties and that the modification was necessary to serve the best interests of the children. Although the statute does not expressly state so, the court is also required to make a finding that the children's present environment actually may place them in serious danger. (See *In re Marriage of Noble* (1989), 192 Ill. App. 3d 501, 548 N.E.2d 518.) The paramount concern in a hearing to modify custody is the best interests of the children. *Kjellesvik v. Shannon* (1976), 41 Ill. App. 3d 674, 355 N.E.2d 120.

The policy of section 610(b) of the Act is to favor the finality of custody judgments and to make modifications more difficult. (*In re Marriage of Burke* (1989), 185 Ill. App. 3d 253, 541 N.E.2d 245.) The effect of this section is to create a legislative presumption in favor of the present custodian, thus promoting the continuity and stability of the child's custodial and environmental relationship which is not to be overturned lightly. (*In re Marriage of Kramer* (1991), 211 Ill. App. 3d 401, 570 N.E.2d 422.) The discretion of the trial court with respect to a change of custody is not unlimited (*Applegate v. Applegate* (1980), 80 Ill. App. 3d 81, 399 N.E.2d 330), but rather is tempered by the desire for finality in custody judgments and the presumption in favor of the current custodian. (*Brandt v. Brandt* (1981), 99 Ill. App. 3d 1089, 425 N.E.2d 1251.) Once the lower court has determined that the pre-

sumption in favor of the present custodian has been overcome by proving the requirements of section 610 by clear and convincing evidence, a reviewing court will not disturb that finding unless it was contrary to the manifest weight of the evidence or amounted to an abuse of discretion. *In re Custody of Sussenbach* (1985), 108 Ill. 2d 489, 485 N.E.2d 367.

Unfortunately, I am compelled to believe that the trial judge and the majority were more concerned with punishing the mother for one misguided act than with considering what was in the best interests of the children. The trial judge's findings in the instant case were that the children's environment placed them in serious danger and that there had been a change in circumstances. The judge listed the changes in circumstances as follows:

> "That [Robin] experiences immediate and uncontrollable anger when things go wrong; that [Robin] demonstrated her immediate and uncontrollable anger in a telephone conversation that was recorded with her knowledge; that [Robin] threatened [Wayne] with a gun that had bullets in the clip while the children were present in the general area; and that Robin has a violent temper, which she has displayed on several of the aforementioned occasions, both in the presence of her ex-husband and the minor children."

After a careful review of the record, I have not found support for the findings of the trial court. I disagree with the majority's assertion that I weighed the evidence and sought to try the case *de novo*. Rather, I sought to find out if there was evidence in the record to support the trial court's findings. I could find no evidence that the children were endangered by living with their mother or that they had suffered any adverse effects from the present custodial situation.

The judge's finding that the children's present environment seriously endangered their physical, mental, moral and emotional health was contrary to the manifest weight of the evidence. There is simply nothing in the record that would indicate that the children are now, or ever have been, endangered by living with their mother. To the contrary, the record shows that Robin is a caring and loving mother who spends as much time as possible with her children, is concerned with their education, and has provided them with a stable home life. There is unquestionably much hostility between Robin and Wayne, but this has not had a noticeable adverse effect on the children. The record in this case reflects several specific incidents of hostility between the parties. Such isolated incidents of animosity between the parties, when it has not been shown that they have had any adverse effects on

the children, are insufficient to warrant a change in custody. (See *In re Marriage of Gargus* (1981), 97 Ill. App. 3d 598, 423 N.E.2d 193.) In fact, by statute, the court is not to consider conduct of a present or proposed custodian that does not affect his relationship to the child. (See 750 ILCS 5/602(b) (West 1992).) The majority cites three cases dealing with cohabitation and fornication for the proposition that no evidence of adverse effects is required before custody can be changed. The majority cites no cases for the proposition that isolated incidents of hostility, absent a showing of present or future adverse effects, are sufficient to warrant a change in custody. It would add nothing to this dissent for me to explain the difference between fornication and hostility, so, suffice it to say that the cases cited by the majority are not applicable to the facts of this case.

The majority tries to compensate for a complete lack of evidence by examining certain behavior of Robin's that the majority finds offensive, and then stating that such behavior is "likely" to affect the moral and emotional health of the children. However, Wayne produced no expert testimony that any behavior of Robin's would affect the moral and emotional health of the children, so the majority is forced to speculate. The majority later in the opinion contends that reviewing courts are not free to rely on speculation.

It seems clear (at least to me) from the record that the trial judge's findings were based primarily on the gun incident. Although I believe that this course of action by Robin demonstrated a serious error in judgment, and while I certainly do not condone such behavior, I do not believe that it was sufficient to show that the children were endangered by living with their mother. The children were in the van at the time of the incident and would have remained blissfully unaware of the fact that there was a gun present if their father had not chosen to involve them in the matter. Wayne admitted on cross-examination that the children were unaware of the presence of a gun until he yelled to them. Wayne yelled to the two younger children that their mother had a gun, when in fact he had already disarmed her and the gun was lying several feet away. Wayne also called for Billy to get tie straps to tie up his own mother. Therefore, if not for Wayne's actions, the children would have thought this was merely another argument between their parents. Further, Wayne felt it necessary to call the children together for a family meeting at which he told them he thought their mother was going to kill him. No testimony was introduced to show that the children suffered any adverse effects from the gun incident or were having any difficulties at home.

I also believe that the finding of the trial court that there had been a change in circumstances was manifestly against the weight of the evidence. The parties had exhibited hostility towards each other before and after their divorce. They both testified that they had not been able to get along for some time. The judge stated that the change in circumstances was that the children are now endangered, but the record was devoid of evidence that the children were endangered by living with their mother.

The finding that Robin experiences immediate and uncontrollable anger when things go wrong is not supported by the record. The record only shows that Robin experiences extreme anger when arguing with her ex-husband. There was nothing to indicate that this was a general reaction to when things went wrong. Further, the telephone message did not demonstrate "immediate and uncontrollable anger." Robin was angry that Wayne gave her a W-2 for Timmy past the deadline for issuing W-2s, and left a message displaying her anger in which she used several profanities. To say this showed that her anger was "uncontrollable" was not supported by the record.

I also take issue with the majority's reliance on evidence regarding Robin's relationship with Billy in support of its decision. Custody of Billy was not an issue in this case; the sole issue was the custody of Donnie and Timmy. Both parties admitted to using physical discipline on Billy, and I fail to understand how that testimony can be relied on to justify the change in custody.

I further believe that the trial judge abused his discretion in denying Robin's motion to interview Donnie and Timmy *in camera*. The majority is correct that section 604(a) gives the trial judge discretion whether to conduct such an interview, but section 602 of the Act (Ill. Rev. Stat. 1989, ch. 40, par. 602) is mandatory in requiring the court to consider the wishes of the child as to custody. In the instant case, there was no evidence introduced as to the wishes of the children. The majority does not explain how the court could have considered the wishes of the children if there was no evidence of those wishes and there was no *in camera* interview. There was testimony in this case that Donnie and Timmy did not get along with Billy and that Billy was always picking on them. Robin testified that the younger boys often cried when they had to go to their father's house because Billy was always hitting them when they went there, a fact ignored by the majority when it states that the evidence showed that problems only occurred when the boys were with their mother. It seems to me if there is evidence in a case that the children at issue are afraid of going to one of the houses, their wishes as to custody should be

heard. The circuit court and the majority, under the guise of the "best interests of the children," have placed the children in a home they feared, where they are picked on and hit by an older sibling. Contrary to the majority's assertion, this interpretation does not render section 604(a) meaningless. Obviously discretion is necessary because in some cases there will be other evidence of the wishes of the children. In this case there was no such evidence. My interpretation represents a logical way to read the mandatory language of section 602 with the discretionary language of section 604.

In support of its position, the majority relies on the case *People ex rel. Bukovic v. Smith* (1981), 98 Ill. App. 3d 144, 423 N.E.2d 1302, a case involving a custody dispute between a natural parent and grandparents. The majority knows that these types of cases have always been analyzed differently from those involving two natural parents. As the *Bukovic* court stated, "custody may be awarded in derogation of the right of the natural parent only where compelling reasons for such a disposition are demonstrated." (*Bukovic*, 98 Ill. App. 3d at 153, 423 N.E.2d at 1309.) Also, as the passage quoted by the majority indicates, the *Bukovic* court believed that an interview would not be fruitful because there was evidence that the boys' grandfather was exerting too much influence over them. In the case at bar, there was no evidence that Robin was exerting any improper influence over the boys, and I hope the majority does not mean to imply that she was. Such an implication would be completely unwarranted speculation.

Wayne Sims has not produced sufficient evidence in this case to satisfy the requirements of section 610 and thereby overcome the strong presumption in favor of the present custodial arrangement. Because I believe that the findings of the trial court were against the manifest weight of the evidence, I would reverse the judgment of the circuit court.

Accordingly, I dissent.