(No. 87702.—

*In re* N.B. (The People of the State of Illinois, Appellee, v. Ca. R., Appellant).—*In re* C.R. (The People of the State of Illinois, Appellee, v. Ca. R., Appellant).

*Opinion filed May 18, 2000.*

Stephen W. Baker, Public Defender, and Phyllis M. Devitt, Assistant Public Defender, of Wheaton, for appellants.

James E. Ryan, Attorney General, of Springfield (Joel D. Bertocchi, Solicitor General, and Patrick W. Carlson, Assistant Attorney General, of Chicago, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

The State of Illinois petitioned the circuit court of Du Page County to make N.B. and C.R., the minor children of respondent Ca. R. (respondent), wards of the court. The State alleged that the minors were neglected, as that term is defined by the Juvenile Court Act of 1987 (705 ILCS 405/1—1 et seq. (West 1998)), because they were subjected to an "environment *** injurious to [their] welfare." 705 ILCS 405/2—3(1)(b) (West 1998). Following an evidentiary hearing, the circuit court found that the children were neglected. 705 ILCS 405/2—18 (West 1998). At a subsequent hearing, the court ruled that the children should be made wards of the court. 705 ILCS 405/2—21 (West 1998). Respondent appealed from the findings of neglect. The appellate court affirmed with one justice dissenting. Nos. 2—98—0653, 2—98—0656 cons. (unpublished order under Supreme Court Rule 23). The appeal is before this court pursuant to Illinois Supreme Court Rule 315 (177 Ill. 2d R. 315). We reverse.

BACKGROUND

On April 17, 1997, the State of Illinois filed separate, original neglect petitions in the circuit court of Du Page County, on behalf of minors C.R. and N.B. At the time

the petitions were filed, C.R. and N.B. were ages four years and three months, respectively. The petitions named S.B. and respondent as the parents of N.B., and R.R. and respondent as the parents of C.R. The State asserted that N.B. and C.R. were "neglected minors," as defined in the Juvenile Court Act of 1987 (705 ILCS 405/2—3(1)(b) (West 1998)), in that they were under the age of 18 years and that their "environment is injurious to [their] welfare." The petitions stated that it was in the best interest of N.B. and C.R. and of the public that N.B. and C.R. be made wards of the court.

On February 3 and March 13, 1998, the court conducted an evidentiary hearing on the State's petitions. The State introduced evidence regarding the incidents that prompted the petitions for a finding of neglect. Witnesses testifying on the State's behalf averred that, while at a Du Page County health department (health department) facility on April 7, 1997, respondent became enraged when she was informed that the coupons she wished to redeem for milk for her children could only be redeemed for powdered milk, and were not redeemable for liquid milk. Health department regulations precluded giving liquid milk to anyone, like respondent, who lacked a permanent address. One witness described respondent's behavior as a "tantrum" and stated that, during her confrontations with health department employees, respondent threw her milk coupons, jacket and diaper bag into some chairs in the room where the outburst occurred. According to the witnesses, respondent thereafter decided to leave. She picked up the handheld baby carrier, containing N.B., that was at respondent's feet, and as she picked up the baby carrier, respondent's arm swung far from her body so that the baby carrier hit a wall. The witnesses maintained that respondent did not check to see if N.B. was harmed.

The State adduced additional evidence that, one week

later, respondent and N.B. returned to the health department facility for an examination. The examination room contained a camera. Respondent refused to enter the exam room until the camera was covered. A social service caseworker also testified that she had weekly contact with respondent between December 1995 and June 1996. In that time period, the caseworker testified, she saw no signs of child abuse and that respondent satisfied the requirements set for her by state social services. Respondent presented no evidence on her own behalf. The circuit court found that the State proved the existence of an injurious environment to the minors and, at a subsequent dispositional hearing, ordered that the children be made wards of the court. Respondent appealed.

The appellate court consolidated the appeals from the separate findings of neglect as to C.R. and N.B. The appellate court affirmed the finding of neglect. Nos. 2—98—0653, 2—98—0656 (unpublished order under Supreme Court Rule 23). A majority of the appellate panel held that the trial court's finding of neglect arising from an "injurious environment" was not against the manifest weight of the evidence. The majority also held that the circuit court applied the correct standard in determining whether the State met its burden of proof at the neglect hearing. The dissenting justice disagreed that the evidence supported a finding of neglect. According to the dissent, respondent only directed her anger toward "bureaucratic functionaries." The dissent maintained that an isolated display of anger by respondent, during which the children were unharmed, did not justify stripping respondent of the custody of her children.

We granted respondent's petition for leave to appeal pursuant to Supreme Court Rule 315 (177 Ill. 2d R. 315).

## ANALYSIS

The finding of neglect entered by the circuit court in this case was just one step in a multistep process that

determines whether children should be removed from their parent or parents and become wards of the court. The process is prescribed by the Juvenile Court Act of 1987 (705 ILCS 405/1—1 *et seq.* (West 1998)). A finding of abuse, neglect or dependence is a necessary predicate to an adjudication of wardship of a child. 705 ILCS 405/ 2—21 (West 1998); *In re K.G.*, 288 Ill. App. 3d 728, 735 (1997). The State bears the burden of proving neglect, dependence or abuse by a preponderance of the evidence, meaning proof that makes the condition more probable than not. *In re K.G.*, 288 Ill. App. 3d at 735; *In re B.C.*, 262 Ill. App. 3d 906, 909 (1994); *In re C.C.*, 224 Ill. App. 3d 207, 215 (1991).

If the State fails to prove the allegations of abuse, neglect or dependence by a preponderance of the evidence, the court must dismiss the petition. 705 ILCS 405/2— 21(1) (West 1998); see also *In re M.B.*, 235 Ill. App. 3d 352, 377 (1992), quoting *In re Shawn B.*, 218 Ill. App. 3d 374, 380 (1991) (a finding of abuse, neglect or dependence is jurisdictional, "without [which] the trial court lacks jurisdiction to proceed to an adjudication of wardship"). If the State meets its burden, the court must proceed to a second adjudicatory stage, in which the court determines whether "it is consistent with the health, safety and best interests of the minor and the public that he be made a ward of the court." 705 ILCS 405/2—21(2) (West 1998). In any proceeding initiated pursuant to the Juvenile Court Act of 1987, including an adjudication of wardship, the "paramount consideration" is the best interest of the child. *In re K.G.*, 288 Ill. App. 3d at 734-35; see *In re A.P.*, 179 Ill. 2d 184, 197 (1997); *In re Stilley*, 66 Ill. 2d 515, 520-21 (1977); *In re Z.R.*, 274 Ill. App. 3d 422, 428 (1995); *In re D.M.*, 258 Ill. App. 3d 669, 672 (1994).

## I. Whether the Circuit Court Employed an Incorrect Standard to Determine if the State Satisfied Its Burden of Proof

Respondent argues that the circuit court failed to hold the State to the correct burden of proof when the court ruled that C.R. and N.B. had been neglected by their mother. Respondent maintains that the circuit court grounded its ruling on what was in the "best interests" of the children, rather than deciding whether the State proved its case by a preponderance of the evidence. For this reason, respondent requests that this court reverse the circuit court's adjudication of neglect.

At the conclusion of the hearing on March 13, 1998, the circuit court recited in detail the basis for its ruling. During the course of its oral remarks, the court stated: "Now ultimately, the finding that I must make must be in the child's best interest, and this is what the ultimate burden of standard is." Later, the court stated: "Based on the evidence, I'm making an adjudication at this time. The first question in the hearing, whether or not the petition has been sustained by the evidence, my conclusion for the reasons I have indicated, the court's observations, the *K.G.* [288 Ill. App. 3d 728] case, every case must be determined on its own facts. The evidence does support that finding."

We do not agree with respondent that the circuit court's passing reference to the "best interests" of the minors indicates that the court applied an erroneous standard. As an initial matter, the court referred to the best interest consideration as "the ultimate burden of standard." This phrase is nonsensical, so we cannot be precisely sure what the circuit court meant by this. However, the record on appeal reveals that throughout the proceedings, the circuit court understood the several steps involved in the adjudication of wardship, and the principles of law to be applied at each stage. For example, in making its finding of neglect, the circuit court

indicated its awareness that another step remained in the wardship proceedings by stating, "Now the next step of the proceedings will be to schedule a dispositional hearing." The court's reference to the best interests of the minors may simply be an acknowledgment by the court that, should the proceedings reach the adjudication of wardship stage, it would have to determine the best interests of the minors. 705 ILCS 405/2—21(2) (West 1998).

The totality of the circuit court's remarks illustrates that the court ruled in the State's favor only after the court found that the State proved the allegations of neglect asserted in the State's petition. Although the court failed to expressly note that it was applying a preponderance of the evidence standard, such a statement is not necessary. *People v. Hoots*, 228 Ill. App. 3d 42, 53 (1992). The circuit court is presumed to know the law and apply it properly, absent an affirmative showing to the contrary in the record. *People v. Kluxdal*, 225 Ill. App. 3d 217, 223 (1991). Our review of the circuit court's findings leads us to conclude that the court understood the State's burden to prove the allegations of neglect by a preponderance of the evidence, and entered its adjudication of neglect based on that standard. *Hoots*, 228 Ill. App. 3d at 53 ("In determining the sufficiency of a judgment, the entire record may be searched to support the judgment").

## II. Whether the Circuit Court's Adjudication of Neglect Was Against the Manifest Weight of the Evidence

Respondent next argues that the circuit court's adjudication of neglect was against the manifest weight of the evidence. Respondent asserts that the circuit court errantly based its decision on a single incident of anger displayed by respondent, in which her temper was not directed at her children, and that the court ignored countervailing proof that respondent did not raise her children in an "injurious environment."

The State alleged that N.B. and C.R. were neglected pursuant to the following provisions of the Juvenile Court Act of 1987:

"(1) Those who are neglected include:

\*\*\*

(b) any minor under 18 years of age whose environment is injurious to his or her welfare[.]" 705 ILCS 405/2—3(1)(b) (West 1998).

In *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952), the supreme court defined "neglect" as the "failure to exercise the care that circumstances justly demand." The *Wallace* court also said:

"[Neglect] embraces wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." *Wallace*, 411 Ill. at 624.

*In re Stilley*, 66 Ill. 2d at 520; *In re K.G.*, 288 Ill. App. 3d at 735.

Further, an " '[i]njurious environment' " is an " 'amorphous concept which cannot be defined with particularity.' " *In re M.Z.*, 294 Ill. App. 3d 581, 593 (1998), quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995); *In re Z.R.*, 274 Ill. App. 3d at 427. Each petition alleging an injurious environment is unique, and must be decided according to the circumstances of that case. *In re K.G.*, 288 Ill. App. 3d at 735. Generally, however, our courts have interpreted "injurious environment" to include the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children. *In re M.K.*, 271 Ill. App. 3d at 826.

These rules of law illustrate the fact-driven nature of neglect and injurious environment rulings. Accordingly, we will reverse a finding of neglect only if it is against the manifest weight of the evidence. *In re Z.R.*, 274 Ill. App. 3d at 427. A decision is against the manifest weight of the evidence if the facts clearly demonstrate that the court should have reached the opposite result. *In re Z.R.*,

274 Ill. App. 3d at 427, quoting *In re T.B.*, 215 Ill. App. 3d 1059, 1062 (1991).

On the issue of neglect in the case at bar, the circuit court heard testimony from Cindy Anderson, who is employed as a dietician by the health department. Anderson testified that, on April 7, 1997, while at a health department facility, she was summoned by a coworker to respond to respondent's refusal to accept powdered milk for her children, in lieu of liquid milk. Anderson went to a waiting room where she found respondent sitting in a chair. A small boy about four years old (C.R.) was standing approximately five feet from respondent, and a baby carrier, covered with a blanket, was at respondent's feet. N.B. was in the baby carrier. Anderson began to explain health department rules regarding milk subsidies to respondent. Anderson stated that she was no more than two sentences into her explanation when respondent began to scream and throw a tantrum. According to Anderson, respondent threw a jacket, a diaper bag and her coupons into some chairs near her. She also kicked a chair. Anderson stated that respondent did not throw anything at Anderson.

After respondent kicked the chair, she started gathering her belongings to leave. She picked up the baby carrier and, as she turned, she swung the baby carrier into a wall. Respondent was holding the carrier parallel to her shoulder. Anderson shouted, "Watch the baby!"

Anderson stated that respondent did not check the baby after the carrier hit the wall, although she did say, "My baby is fine." Because the carrier was covered with a blanket, Anderson could not see N.B. She conceded that she did not hear N.B. cry when the carrier hit the wall, and that Anderson saw no damage to the carrier or the wall as a result of the carrier striking it.

Anderson testified that respondent screamed at Anderson and said that if Anderson said another word to

her, she was "going to go ballistic on [Anderson]." Anderson testified that respondent's anger was directed at Anderson "and the people and the surrounding and the kids were in the surrounding."

Anderson admitted that the children appeared to be adequately clothed. Anderson did not have the opportunity to assess the minors' "nutritional status." C.R. tugged at Anderson's lab jacket and said, "Look what you did to my mommy."

Becky Elbrecht is also employed by the health department. On April 7, 1997, Elbrecht was at the health department facility. She heard a commotion from a waiting room on the floor beneath her and went to investigate. She found respondent and health department employees in an argument.

Elbrecht talked to respondent after respondent's confrontation with Anderson. Elbrecht described respondent as initially agitated and upset, but she responded to Elbrecht's attempts to calm her down. Respondent asked if she could use a telephone. Elbrecht said that respondent then left abruptly and said nothing to Elbrecht as she left.

Elbrecht testified that respondent never struck her children in Elbrecht's presence. During the initial confrontation in the waiting room, C.R. appeared agitated. Elbrecht said C.R. was not crying, but was "upset by the situation."

The court also received testimony from Catherine Maney. Maney stated that, on April 15, 1997, she was doing "outreach casework" for the health department. Respondent, accompanied by N.B., was at the facility, apparently for an examination by a physician. Respondent refused to enter an exam room until Maney covered a camera that was in the exam room. Maney said that respondent alternated between anger and crying during this encounter. The encounter lasted about 15 minutes.

Maney next saw respondent in May 1997, at which time she was angry with Maney. Respondent said Maney was the reason her children were taken from her.

Testimony was also given by Katherine Dello, who is employed by Metropolitan Family Services as a clinical social worker. In December 1995, Dello was working with a program called "Family Preservation." The program performs in-home counseling and other services for families that the Illinois Department of Children and Family Services has "indicated" for child abuse or neglect.

Beginning in December 1995, Dello saw respondent at least once a week for approximately six months. Dello would meet with respondent either at her apartment or at an agreed place. They would discuss respondent's "stabilizing her lifestyle" and taking care of her child. (This was prior to N.B.'s birth.)

Dello said she saw C.R. with his mother at least every other week. The child always appeared to be well taken care of and properly clothed. Dello observed respondent get frustrated with her son, but Dello never saw her strike or abuse the boy in any way. Dello described respondent's frustration as "acting like a typical parent who is tired and trying very hard to do what's best for a child. And kids don't always do what they're told."

Dello testified that respondent was always very cooperative with Dello concerning their meetings. Respondent made "satisfactory progress" on everything Dello asked her to do. Dello's visits with respondent ended in June 1996 because she made adequate progress and there was no further need for Dello's services.

After the court heard the testimony of Anderson, Elbrecht, Maney and Dello, the State rested its case. Respondent presented no evidence on her own behalf.

At the conclusion of the hearing, the circuit court ruled that the April 7 and April 15, 1997, incidents at the health facility indicated that the minors were living

in an injurious environment. The court stated, "[I] do think it is an ... injurious aspect of a child's environment if the child is subject to anger, and to excessive emotion which renders adult supervisors in the child's life out of control." The court also found that respondent's anger "got away with [her]," and, "What is indicated here is ... some type of emotional disorder in which the child may not be subject to proper supervision."

The circuit court acknowledged that certain evidence of respondent's behavior did not support a finding that the children were exposed to an injurious environment. Concerning the April 15, 1997, incident at the health facility, when respondent insisted that the camera in the exam room be covered, the court acknowledged that the incident posed no threat to C.R., the child with respondent at the time. As for Dello's interactions with respondent over a six-month period, the circuit court said that nothing "adverse" could be drawn from the evidence, but for the fact of respondent's prior involvement with health counselors.

Critically, the court ruled that respondent demonstrated concern for her children, and that there was "no clear proof" that N.B. or C.R. lacked food, clothing, medical assistance, or a proper home.

Based upon the evidence of record, we hold that the court's determination that N.B. and C.R. were subjected to an injurious environment is against the manifest weight of the evidence. The evidence adduced is devoid of any instance in which respondent abused or mistreated her children in any way. In fact, quite the opposite was shown to be true. Dello testified that C.R. always appeared well cared for in the six months that she saw C.R. Anderson had no criticisms of the children's appearance on April 7, 1997, and she had no reason to believe that they were undernourished. Although Anderson and her coworkers were concerned for N.B.'s well-being when the

baby carrier struck the wall, the baby did not cry, and no one saw any harm to the child as a result. And while Anderson maintained that respondent showed no concern for N.B. after the carrier hit the wall, Anderson admitted that respondent said, "My baby is fine." Inasmuch as N.B. did not cry, and no one could see any injury to N.B., respondent's statement was no less valid than Anderson's speculation to the contrary.

There was no evidence that respondent's temper, though admittedly strong, posed any harm to her children. Dello testified that when respondent showed signs of frustration with C.R., the frustration was consistent with any parent's reactions to a three-year-old child. Nor does the proof adduced at the adjudicatory hearing support the inferential leap that when respondent loses her temper, she becomes blinded to the well-being of her children. In sum, the circuit court's ruling turned on two incidents in which respondent displayed anger at persons not her children, and in which there was no proof of actual harm to her children. When coupled with Dello's testimony, which indicated acceptable parenting by respondent, we find no evidence to suggest that respondent breached her duty to provide a "safe and nurturing shelter" for C.R. and N.B. *In re M.K.*, 271 Ill. App. 3d at 826.

The State contends that, as a matter of law, exposure to "uncontrolled anger" is sufficient to establish an injurious environment. However, the cases cited by the State are readily distinguishable from the instant case. In *In re M.K.*, 271 Ill. App. 3d 820 (1995), the trial court found that the minor M.K. was subject to an injurious environment in part because M.K's mother's paramour, McDuffie, had a bad temper. *In re M.K.*, 271 Ill. App. 3d at 827. However, the court also relied on the fact that one of McDuffie's own children had been removed from McDuffie's custody because McDuffie abused the child.

Also, M.K.'s mother continued to allow McDuffie access to M.K. despite warnings of McDuffie's past abusive behavior and warnings that continued exposure to McDuffie might cause the mother to lose custody of M.K. The risk of harm to M.K. was substantial enough to support a finding of neglect. *In re M.K.*, 271 Ill. App. 3d at 827.

The next case relied upon by the State, *In re Marriage of Johnson*, 245 Ill. App. 3d 545 (1993), disposed of a custody dispute arising from the dissolution of a marriage. Relying on the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 *et seq.* (West 1992)), the trial court in *Johnson* terminated joint custodial responsibilities shared by a divorced couple and transferred sole custody of the couple's children to the father of the children. The circuit court determined that the children's mother was prone to uncontrolled rages directed at the father, rendering the joint custody arrangement "unworkable." *Johnson*, 245 Ill. App. 3d at 551-52. The evidence included instances where, in the presence of the children, the mother attempted to fire a loaded gun at the father, physically attacked a friend of the father, and pounded on the windows of the father's home and screamed at him while the children were in the home. *Johnson*, 245 Ill. App. 3d at 548-49, 552. The custodial hearing also yielded evidence that the mother felt she was unable to control the behavior of the oldest child and on several occasions struck him, once with a yardstick. She also struck another child. *Johnson*, 245 Ill. App. 3d at 552-53. The appellate court affirmed the trial court's findings that the couple's children were in an environment that could "endanger seriously [their] physical, mental, moral or emotional health." *Johnson*, 245 Ill. App. 3d at 549, 554.

In contrast to *In re M.K.*, 271 Ill. App. 3d 820, there is no proof in this case that respondent ever exposed her

children to any source of physical abuse. Unlike *In re Marriage of Johnson*, 245 Ill. App. 3d 545, moreover, there is no evidence that respondent's temper has ever assumed the form of assault with a deadly weapon, physical attacks on another person, or physical attacks on her children.

The State also insists that the court did not have to wait until N.B. and C.R. suffered actual abuse before the court could find an injurious environment. *In re S.D.*, 220 Ill. App. 3d 498, 504 (1991). Again, the decisions upon which the State relies are inapposite to the facts here. In two of the cases, actual abuse visited upon another member of the household provided concrete proof of an injurious environment that warranted removing the threatened minor from the adult's custody. See *In re Z.R.*, 274 Ill. App. 3d 422 (1995) (an adult in the minor's household abused at least one other child in the home); *In re A.D.R.*, 186 Ill. App. 3d 386 (1989) (the father repeatedly beat the minor's mother). Further, *In re J.W.*, 289 Ill. App. 3d 613 (1997), is distinguishable because the minor in that case was an infant born prematurely whose special medical needs required home monitoring and regular visits by a public nurse. The mother's history of alcohol abuse and inability to furnish health care workers with a permanent address placed the minor's physical well-being in jeopardy and furnished adequate proof that the mother subjected the child to an injurious environment. *In re J.W.*, 289 Ill. App. 3d at 619.

At bar, the State's evidence consisted of two displays of temper not directed to the children or another member of their household. The State failed to show anger of a frequency, duration or quality that would indicate that the children lived in an environment that exposed them to, or threatened them with, emotional or physical injury. While we may not approve of respondent's behavior before her children, we must conclude, on the record

354

before us, that the finding of neglect was against the manifest weight of the evidence.

CONCLUSION

For the reasons stated above, we reverse the judgment of the appellate court and reverse the trial court's order adjudicating N.B. and C.R. neglected pursuant to section 2—3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2—3(1)(b) (West 1998)). We order that the State's petitions for neglect be dismissed.

*Appellate court reversed;*
*circuit court reversed.*