(No. 98927.— ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)

*In re* FAITH B. *et al.* (The People of the State of Illinois, Appellee, v. Perseta D., Appellant).

*Opinion filed June 16, 2005.*

McMORROW, C.J., specially concurring.

Anna M. Wilhelmi, of Aurora, for appellant.

Lisa Madigan, Attorney General, of Springfield (Gary Feinerman, Solicitor General, and Jan E. Hughes, Assistant Attorney General, of Chicago, of counsel), for the People.

Charles P. Golbert and Janet L. Barnes, of the Office of the Cook County Public Guardian, of Chicago, for *amicus curiae* Robert F. Harris, Cook County Public Guardian.

JUSTICE FREEMAN delivered the opinion of the court:

In proceedings under the Juvenile Court Act of 1987 (705 ILCS 405/1—1 *et seq.* (West 2002)), "dispositional" orders are final and appealable as of right, but orders setting permanency goals are ordinarily interlocutory, and thus appealable only at the discretion of the appellate court. See 155 Ill. 2d R. 306(a)(5). In this case the circuit court of Kane County set a permanency goal within a dispositional order, and we must determine whether the parent could invoke the appellate court's jurisdiction to review the permanency goal by appealing from the dispositional order. In addition, the parent contends that the circuit court's finding that the minors were abused and neglected was against the manifest weight of the evidence.

## BACKGROUND

This case began with a call to the Department of Child and Family Services (DCFS) hotline in July 2003 concerning an altercation involving minors Faith B. and Stephen B. and their mother, Perseta D. As a result of that call, the State filed a petition for adjudication of neglect. In that petition, the State alleged that Faith, age 12, and Stephen, age 16, were neglected and abused minors, because their environment was injurious to their welfare. Specifically, the State alleged that Perseta struck the children and that Perseta's mental health issues placed them at risk of harm. The State also alleged that Faith and Stephen were neglected and abused because of domestic violence.

The record reveals that DCFS issued another report on Perseta in May 2003, shortly before the July 2003 hot-line call, although this report was later determined to be unfounded. Prior to that time, in December 2002, Perseta had entered Provena Mercy Center Hospital, where staff diagnosed her as bipolar with psychotic features, and prescribed her psychiatric medication for that condition.

The court held a status hearing in August 2003 in order to determine whether Perseta had engaged private counsel or would proceed with the assistance of the public defender. It was determined that the public defender would represent Perseta. During this hearing, the court admonished Perseta that she should cooperate with DCFS or she might run the risk of losing her parental rights. In response, Perseta stated:

> "I am refusing to go to Provena Mercy Hospital. I have no indications [sic] on doing that.
>
> If that means that I lose my kids, well, then, we can do that today, because I will never go back there ever again. Not after the last treatment."

It was made clear at the status hearing that the children were then residing with their aunts, not with Perseta,

and that Perseta consented to this arrangement. At the hearing, Perseta signed an agreement allowing the children's aunts to enroll them in school and to consent on their behalf to any required medical procedures. She refused, however, to grant anyone legal guardianship or custody.

On November 4, 2003, the court held an adjudicatory hearing on the petition. DCFS investigator Peggy Maher testified that in May 2003 DCFS issued a report that Perseta posed a substantial risk of harm to the children. At that time, DCFS attempted to persuade Perseta to get an updated mental health assessment and resume taking the psychiatric medication which had previously been prescribed for her. Perseta refused to follow DCFS's recommendation, however, and did not seek any mental health services. Perseta's children and family members told DCFS that she needed help, because she might pose harm to herself in the future. However, the children also said in May that they did not believe *they* were at risk, and accordingly DCFS eventually concluded that the May report was unfounded.

Maher was also the investigator assigned to the July 2003 hot-line call. She interviewed Faith, Stephen, Tina Fowler—Perseta's sister, and the children's aunt—and the children's older brother Michael, regarding the incident. Maher testified Faith told her that she and Perseta had gone to Fowler's home, to pick up some mail. Perseta became agitated, and began cursing and swearing at Faith because "she had been throwing the mail out, the mail didn't need to be coming there." Then Perseta attacked Faith physically, slapping and hitting her. Stephen attempted to separate his mother and sister, and Perseta attacked him as well, hitting him several times in the stomach. The altercation did not end until Fowler jumped on Perseta's back in order to restrain her.

Maher testified that the children told her that Per-

seta had stopped taking her medication. They did not believe that their mother would seriously harm them, but they were becoming less sure what she would do. They told Maher that Perseta "just never seemed to sleep anymore and she seemed very erratic." The children told Maher that because of their mother's condition, they felt safer staying somewhere other than their mother's home.

Maher stated that Perseta had accompanied the children to Maher's office for their interview, and Maher had to ask her to leave because she was very agitated and very aggressive toward Maher. Perseta returned the next day and Maher asked her about the July 2003 incident. Maher testified that Perseta gave conflicting accounts of the incident. She first told Maher that she was being falsely accused, that "everybody was out to get her," and that she never hit her children. Later in the interview, Perseta admitted that she had struck Faith, "because Faith had become mouthy." When Maher pursued this by asking her how many times she had struck Faith, Perseta responded by again denying that she had hit Faith. However, according to Maher, Perseta "then *** would within a minute or so change her mind again, and said, well, yes, I did hit her, but I didn't mean to harm her." In the interview Perseta denied ever striking Stephen.

At the end of the interview, Maher asked Perseta to enter into a "Safety Plan," to alleviate the concerns raised by the July 2003 incident. Under the proposed plan, the children would remain in their aunts' care until Perseta sought medical attention, resumed her medication, and became stable. Perseta refused to sign the plan. Maher testified that Perseta said she "was being persecuted, that I didn't know what it was like, that the FBI was chasing her, that there are people in her home out to get her."

Perseta testified at the adjudicatory hearing that she

had struck Faith in July, but that it was accidental. She denied striking Stephen. She further stated that she had been admitted to Provena Hospital in December 2002. During cross-examination, Perseta explained:

> "The reason that I went to go talk to somebody was because I was having all of these events that were happening in my home. I was having people call me a maggot. I was having—I would drive my car and people would try to run me off the road. I would go in—"

After Perseta's counsel attempted to object to the narrative form of her client's testimony, Perseta continued:

> "I would drive and I had people trying to run me off the road. So I went to the police on several occasions and let them know what was going on. There was one instance that I was getting my hair done, and when I came back home, I found two loaves of bread inside my refrigerator. I had locked my apartment door and I know I did not put those loaves of bread in there. I got tired of coming home and finding things missing and so I didn't know what else to do. And I went to my girlfriend and I asked her was she—was any of this going on in her life, did she know anything. And we were driving and we were going to go out to get something to eat, and that's when she took me into Provena to talk to a counselor about what was going on. And that is—and that was when they basically didn't even give me five minutes to explain myself. They just admitted me."

According to Perseta, staff at Provena diagnosed her as bipolar, and prescribed her Risperdal, a psychoactive medication. Staff also recommended a course of follow-up outpatient therapy. Perseta pursued her follow-up therapy for three days, but testified:

> "[A]s I was going there, I just kept having so many things happen to me. I would leave there and people would say behind my back, call me a whore, call me—they would say the water is not killing you fast enough. They would say—
>
> Q. Who are they?
>
> A: Just general public people. I would be in a store and I would be in the aisles and I would be grocery shopping and

you would have a young white girl standing next to me, or some guy would stand next to me, and they would say these things. I don't know why, ma'am. To this day I don't know why. I have been asking this question time and time again. I don't know why."

Perseta testified that although she hoped that the follow-up therapy would stop the things that were happening to her, "When I left it continued. Missing items in my home. I went to the federal government regarding this, because I didn't know what to do. I got so exhausted with—with people calling me a maggot. I think that was the worst part of it because I can't understand what they meant by that." She testified that she

"Heard them [her children] coughing in the middle of the night. I would hear, I would wake up, and I just would feel so—I don't even know how to explain it. I felt like I would wake up. I—I would be coughing. It would be like some kind of odor would be in the house. This is after my husband had left. I think it was really, really intense when I was home by myself cleaning during the day. I would—I would primarily feel that way, but after my husband and I had split up, those few, couple weeks, that's when I really noticed that. Look, I love my children. I did everything I possibly could to protect them. I went everywhere. I didn't know what else to do. If being crazy means that you love your children, you will do anything to protect them, then, yeah, whatever it takes. I went to Fox News. I went to these places. I did everything I could, because I didn't know what to do."

Perseta admitted that she was no longer taking any medication, explaining:

"Made me so drowsy, it made me so sleepy that I felt that I could not watch my children. I could not protect them. I could not—I was—I was—I was just so drowsy all the time and I just couldn't—I couldn't focus. It made me sleep so much that I didn't want to miss them when they came home from school. I had had people coming around my neighborhood taking pictures of my daughter ***. And I didn't know what was going on, so I didn't take the medication, because I wanted to be alert, because I didn't know

who this white car was that was taking pictures of my kid. I didn't know what was going on. I didn't know who these men were that were coming around my building knocking on my door. I didn't know. So I thought that if I didn't take the medication, I would be more alert."

The State also introduced Perseta's medical records into evidence. According to those records, Provena staff first diagnosed Perseta as bipolar with psychotic features in December 2002 and prescribed her Risperdal. Perseta returned to the hospital in May 2003, where doctors again diagnosed her with bipolar disorder, psychotic features, and prescribed her Risperdal, Haldol and Ativan.

At the conclusion of the adjudicatory hearing, the circuit court held that the State had met its burden of proving that the minors were neglected because of an injurious environment. The court based its conclusion on the violence which had occurred in July and the medical records, as well as Perseta's own testimony that she was not taking any medication. The court concluded that the children were at risk of harm because of Perseta's mental health issues and also because of domestic violence. The court also found that the children were neglected because of domestic violence, based on the injury Perseta had inflicted upon them in July 2003, finding specifically that Perseta's testimony that she had struck Faith accidentally was not credible.

Approximately two weeks later, on November 20, 2003, the court held a dispositional hearing. Perseta was not present at the hearing, although several persons including her attorney stated that they had told her about it and thought she had been planning to attend. The DCFS caseworker testified that he had been unsuccessful in his attempts to review the proposed client service plan with Perseta and to offer her services, because Perseta had refused to cooperate and would not discuss any history or sign releases. He testified that

Perseta repeatedly became delusional during their conversations and that "at one point she actually did sign a release and then tore it up." Perseta denied to him, on more than one occasion, that she had mental health issues. He testified that although Perseta did desire that her children be returned, DCFS recommended that guardianship and custody be transferred to the minors' aunts, Tina Fowler and Deboria Ersery. He testified that the aunts as well as the children were in favor of this arrangement.

The children's two aunts also testified. According to Ersery, Stephen currently lived with her, and she was willing to take guardianship of Stephen without any state subsidy. Ersery admitted that Perseta had not agreed to give her guardianship, but stated that Perseta had previously said that she was not in a position to have custody of the children, because she was concerned that "some harm is going to come to them."

Fowler testified that Faith was currently living with her and that she was willing to take guardianship of Faith without any state subsidy. Fowler had spoken to Perseta the night before the hearing, and Perseta had told her that Faith would be better off with Fowler, because "if she stayed with her she would get hurt." Fowler clarified, on cross-examination, that Perseta "thinks that people are after her and she thinks they will try to go through Faith to get to her, and she thinks that the house is poisoned, and things like that. So she want[s] to keep Faith away from her so Faith won't get hurt." When the court asked whether Perseta was aware that there was a court date, Fowler testified that she was—Fowler had even offered Perseta a ride to court, but Perseta had replied that she would rather take the bus.

The court found that Perseta was unfit, unwilling, and unable to care for her children due to her mental illness. The court noted that Perseta's testimony at the earlier adjudicatory hearing

"made it clear to this Court that this lady does have a mental condition that she needs to address. She is not thinking in a coherent manner. Her paranoia was very obvious in court when she was here and certainly it appears throughout the medical records, it appears to be a consistent thing in all of the reports that have been submitted to this Court."

The court additionally found that it was in the children's best interests to be adjudicated wards of the court, and found that it would also be in their best interests to award guardianship and custody of the children to their aunts.

The court inquired of the DCFS caseworker whether DCFS had set a permanency goal of guardianship. The caseworker stated that given the status of the case, DCFS's permanency goal had to be one of returning the children to the parents. The State's Attorney clarified that DCFS internal administrative guidelines precluded setting any goal other than "return home" until after the minors had been adjudicated wards of the court—and the earliest this could happen was at a dispositional hearing. The court stated:

"Well, I am going to comment on that at this point in time, because I think at the dispositional hearing the Court does have to make a determination on the goal, and I think guardianship would be the appropriate goal in this case, at least at this point in time as the mother has indicated that she does not have a mental health issue and indicated— has indicated that she does not wish to seek any treatment. So that means that any kind of a return home goal would be ruled out. And, likewise, certainly because the children are in relative placement here, we are not talking about any kind of substitute care pending termination of parental rights. An adoption would be ruled out, because these children have a long term bond with their mother that I do not believe at this point in time that this Court would ever find that that should be disrupted. I mean, certainly I would need significant evidence to find that the parental relationship would need to be disrupted, which leaves us at the goal of guardianship.

So I give that directive to the Department at this time making the findings that I have already recited."

The court stated that "as this is a final and appealable order, I also admonish [Perseta] that it is such and that she has thirty days to file her notice and motion of appeal."

The court issued a four-page-long form order in the wake of the hearing. That order repeated the court's findings that it was in the minors' best interests to be made wards of the court, and that the mother was unfit, unable, and unwilling to care for the minors because of her mental illness, which she had failed to address. The court ordered that custody and guardianship of the minors be placed with their aunts and that the permanency goal "should be set at guardianship b/c of mother's mental health." Although the form contained a section for ordering a subsequent permanency hearing, the court left that section blank, and set no subsequent permanency hearing. The court continued the case to January for "closure of case." The record before us contains no indication that this subsequent hearing was held, or what occurred at the hearing if it was in fact held.

Perseta appealed, on two grounds. She argued first, the circuit court erred in adjudicating her children abused and neglected, and second, the court erred in setting private guardianship as a permanency goal. A partially divided appellate court affirmed. 349 Ill. App. 3d 930. The court unanimously affirmed the circuit court's determination that the minors were abused and neglected. On the second issue, however, the appellate court majority held that it lacked jurisdiction to review the permanency goal under Rule 303(a), because permanency goals are interim, nonfinal orders, only potentially appealable pursuant to Rule 306(a)(5). 349 Ill. App. 3d at 936-37. Accordingly, the court dismissed that portion of Perseta's appeal. 349 Ill. App. 3d at 938. The dissent did not dispute the majority's characterization of permanency

orders as a general rule, but argued that the majority erred in failing to take into account the fact that in this case, the permanency order was entered as part of the dispositional order. 349 Ill. App. 3d at 938 (McLaren, J., concurring in part & dissenting in part). The dissent accused the majority of elevating form over substance:

> "The majority posits ' "that a permanency goal does not *finally* determine a right or status of a party but instead looks at the anticipated *future* status of the child." ' (Emphasis in original.) 349 Ill. App. 3d at 936, quoting *In re D.D.H.*, 319 Ill. App. 3d at 991. However, an examination of the dispositional order here reveals much 'final determination' and very little of 'anticipated future status.' The trial court found that the initial permanency goal was not appropriate and ordered DCFS to develop a permanency goal of guardianship. The court then set no date for a future permanency hearing and continued the case for 67 days for 'closure of case.' The trial court left no question as to what the *final* goal of this case was to be." (Emphases in original.) 349 Ill. App. 3d at 938-39 (McLaren, J., concurring in part & dissenting in part).

On the merits, the dissenting judge would have affirmed the permanency goal which the circuit court had established. 349 Ill. App. 3d at 941 (McLaren, J., concurring in part & dissenting in part).

Perseta petitioned this court for leave to appeal (155 Ill. 2d R. 315(a)), which we granted. We allowed the Cook County public guardian leave to file a brief on behalf of the State as *amicus curiae*.

## ANALYSIS

### I. Adjudication of Neglect

The State has the burden of proving allegations of abuse, neglect or dependency by a preponderance of the evidence. *In re Arthur H.*, 212 Ill. 2d 441, 463-64 (2004). On appellate review, a trial court's finding of neglect must stand unless it is against the manifest weight of the evidence—if the opposite conclusion is "clearly

evident." *Arthur H.*, 212 Ill. 2d at 464. Only after the State has satisfied its burden of proof of abuse, neglect, or dependence can the circuit court proceed to determine whether it would be in the minor's best interests to be made a ward of the court. *Arthur H.*, 212 Ill. 2d at 464. Only a single ground for neglect need be proven, and thus when the circuit court has found a minor neglected on several grounds, we may affirm if any of the circuit court's bases of neglect may be upheld. See *In re D.D.*, 196 Ill. 2d 405, 422 (2001).

We agree with the appellate court that in cases such as this, it is not enough for the State to show simply that the parent suffers from a mental illness. Rather, the State must also show that the mental illness "places the children in an injurious environment." 349 Ill. App. 3d at 933. However, we find that the evidence adduced before the circuit court sufficed to make this showing.

Clearly, the July 2003 incident involved physical harm to the children. Nor is there any basis for disputing the circuit court's connection of this episode to Perseta's mental health issues; the evidence indicates that Perseta attacked Faith because she was upset at Fowler receiving mail, when Perseta threw the mail away. Although the minors may not have been in immediate fear that Perseta would seriously harm them, they did admit that her behavior was increasingly bizarre and unpredictable. She had begun to sleep irregularly, or not at all. Her children were unsure what she would do, and they admitted their mother's condition caused them considerable stress. They further stated that they were more comfortable living elsewhere unless and until she sought help and was able to stabilize her condition. Moreover, Fowler and Ersery both recounted statements by Perseta that she feared harm would come to the children if they continued to live with her. There is no basis for this court to second-guess the circuit court's determination that Perseta's

mental illness created an injurious environment for her children. We also note that, given Perseta's testimony that she was not taking any medication, and her statement that she would prefer to lose custody of her children rather than return to Provena, there is no basis for concluding that her condition was merely temporary.

The situation here is unlike *In re N.B.*, 191 Ill. 2d 338 (2000), upon which Perseta relies. There, we held that simple evidence that a parent had two angry outbursts was insufficient to demonstrate an injurious environment to her children. See *N.B.*, 191 Ill. 2d at 351. But the outbursts in *N.B.* did not involve physical aggression directed *at* the children. Indeed, in *N.B.*, we specifically distinguished cases in which parents had physically abused their children or exposed their children to sources of physical abuse. See *N.B.*, 191 Ill. 2d at 352-53 (distinguishing *In re M.K.*, 271 Ill. App. 3d 820 (1995), and *In re Marriage of Johnson*, 245 Ill. App. 3d 545 (1993)). Nor, in *N.B.*, were matters complicated by evidence of mental health issues. The case is inapposite.

We therefore affirm the circuit court's adjudication of neglect based on injurious environment. See 705 ILCS 405/2—3(1)(b) (West 2000). Specifically, we find that the circuit court's conclusion that the children were in an injurious environment based on Perseta's unaddressed mental health issues, combined with her demonstrated willingness to engage in physical acts against her children, is not against the manifest weight of the evidence.

Because of our conclusion regarding neglect based on injurious environment, we need not review the circuit court's additional finding that the minors were abused or neglected based on physical abuse (see 705 ILCS 405/2—3(2)(i) (West 2000)).

## II. Appealability of Permanency Order

Perseta also assigns error to the appellate court's

holding that it had no jurisdiction to review the permanency order the circuit court entered. Given the somewhat unusual circumstances of this case, we agree with Perseta that this was error, and remand to the appellate court for consideration of the merits of Perseta's challenge to the permanency order.

The appellate majority focused exclusively on the fact that the portion of the dispositional order to which Perseta objected was a permanency order (see 349 Ill. App. 3d at 936-37), and that permanency goals are generally interlocutory, nonfinal orders, not subject to an appeal as of right. See 349 Ill. App. 3d at 937, citing *In re Curtis B.*, 203 Ill. 2d 53, 59-60 (2002).

The appellate court's characterization of permanency orders is correct as a general rule. As this court has previously stated,

"None of the determinations contained in a permanency order can be considered set or fixed as a matter of law. By statute, the permanency order *must* be reviewed and reevaluated at a minimum of every six months *up until the time the permanency goal is attained*. See 705 ILCS 405/ 2—28(2) (West 1998). Under this requirement, it is not simply the case that the permanency order, once entered, may at some later time be reexamined. Rather, by operation of section 2—28, all of the rights and obligations set forth in the permanency order must remain open for reexamination and possible revision *until the permanency goal is achieved*. Given this fact, there is no reasonable basis upon which we can determine that a permanency order is a final order for purposes of Rule 304(b)(1)." (Emphases added.) *Curtis B.*, 203 Ill. 2d at 59-60.

However, as the appellate court recognized in the instant case, "It is, of course, the nature of the order *** that is relevant in determining whether appellate jurisdiction exists." 349 Ill. App. 3d at 935, citing *In re J.N.*, 91 Ill. 2d 122, 128 (1982). Our conclusion in *Curtis B.* that permanency goals are generally nonappealable was based on certain characteristics of such orders which

are *not* present in the instant case. Specifically, the lynch-pin of our determination that permanency orders are not final and appealable is the fact that they are only temporary and subject to modification. But this characteristic only holds true *until the goal has been reached.* See *Curtis B.*, 203 Ill. 2d at 59-60. Indeed, the Juvenile Court Act specifically provides that once the goal has been achieved, the court need no longer review the case if a suitable relative has guardianship of the minor "and the court determines that further monitoring by the court does not further the health, safety or best interest of the child and that this is a stable permanent placement." 705 ILCS 405/2—28(2) (West 2000).

The permanency order entered in this case was atypical in several ways, each of which indicates that it was intended to be a final and permanent order. First, it was entered as part of a dispositional order, which the circuit court specifically stated was "final and appealable." Second, the circuit court declined to set any subsequent permanency hearings. Third, the trial judge's comments at the dispositional hearing while setting the permanency goal clearly indicated that the court believed the *only* acceptable plan in this case was guardianship by the aunts. Finally, perhaps the most important indications of the circuit court's intent are that the goal was guardianship by a relative, and that the goal *was the status quo at the time the court set the goal.* That is, the goal the court set—guardianship by the aunts—was achieved as soon as the court set it, because in the order setting that goal the court also placed guardianship and custody with the aunts. Thus, unlike a typical permanency goal, there was *no* time during which the goal remained open and subject to modification. All of the facts noted above point to the conclusion that the circuit court intended that the goal would not subsequently be modified.

Thus, because the permanency order was intended as

final and immutable at the time it was entered, we conclude that the appellate court did in fact have jurisdiction to review the order pursuant to Rule 301.

We acknowledge that this is an unusual case. It is quite rare that at the time of the dispositional hearing the circuit court will be sufficiently confident as to the proper permanency goal as to set the goal without scheduling even a single future permanency hearing to review it. However, that is what occurred in the instant case, and it is a possibility which the statute appears to contemplate. See 705 ILCS 405/2—28(2) (West 2000). Nor do we mean to suggest that the speed with which the circuit court arrived at its conclusion is necessarily indicative of any impropriety or insufficient attention to the issues involved in the case. Matters involving child custody ought to be dealt with as quickly as is reasonably possible, in order to minimize the effects of such a proceeding on the minors involved, and that is what occurred in the case at bar.

However, we express no opinion on the propriety of the goal the circuit court set in the instant case. The appellate court did not address the issue because of its determination that it lacked jurisdiction to do so, and the issue was not fully briefed before this court. We believe that the proper course is to remand to the appellate court to review the permanency goal the circuit court set, and we so order.

## CONCLUSION

For the reasons above stated, we affirm the circuit court's conclusion that Faith B. and Stephen B. were abused and neglected minors. We find that the appellate court had jurisdiction to review the permanency goal set by the circuit court under the circumstances of this case, and we remand to the appellate court for consideration of that issue.

*Affirmed in part and*
*remanded in part.*

CHIEF JUSTICE McMORROW, specially concurring:

I agree that the circuit court properly adjudicated Faith B. and Stephen B. neglected minors. I also agree that the appellate court had jurisdiction to review the permanency goal set by the circuit court in this case and that, as a result, remand is necessary. I write separately because I disagree with the majority's rationale for finding the permanency goal reviewable.

As the majority acknowledges, dispositional orders have long been deemed final and appealable as of right, despite the fact that they are subject to modification. See *In re Austin W.*, 214 Ill. 2d 31, 43-44 (2005). However, permanency orders, *i.e.*, orders issued after a permanency hearing held pursuant to section 2—28 of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/2—28 (West 2000)), are generally interlocutory, and thus appealable only at the discretion of the appellate court. See *In re Curtis B.*, 203 Ill. 2d 53 (2002). In the case at bar, respondent, Perseta D., did not appeal from a "permanency order." Rather, she sought review of the appropriateness of a permanency *goal*, which was set at the dispositional hearing and made a part of a dispositional order. For this reason, the appellate court's reliance on *In re Curtis B.* to find that the permanency goal is not appealable is misplaced.

The majority of this court does not directly address the applicability of *In re Curtis B.* Instead, the majority holds that, here, the permanency goal is appealable, but only because of the "somewhat unusual circumstances of this case." 216 Ill. 2d at 16. In my view, the majority's holding is too narrow. I would hold that permanency goals are appealable as of right when they are part of the dispositional order, which is an appealable order.

The permanency goal selected at the dispositional hearing is an intrinsic part of the dispositional order. Pursuant to section 2—21(2) of the Juvenile Court Act

(705 ILCS 405/2—21(2) (West 2002)), once a court determines a minor to be abused, neglected or dependent, "the court shall then set a time not later than 30 days after the entry of the finding for a dispositional hearing." At the dispositional hearing, the court must determine, in accord with the requirements set forth in section 2—22 of the Act, whether it is in the best interests of the minor(s) and the public that the minor(s) be made wards of the court. 705 ILCS 405/2—22(1) (West 2002). In addition, the court *must* decide "the proper disposition best serving the health, safety and interests of the minor[s] and the public" and consider "the permanency goal set for the minor[s], the nature of the service plan for the minor[s] and the services delivered and to be delivered under the plan," as required by section 2—22(1) (705 ILCS 405/2—22(1) (West 2002)).

Section 2—23(1)(a) of the Act identifies the various types of dispositional orders that may be issued. In accord with this section, "[a] minor under 18 years of age found to be neglected or abused under Section 2—3 *** may be *** (2) placed in accordance with Section 2—27 [705 ILCS 405/2—27 (West 2002)]." 705 ILCS 405/2—23(1)(a)(2) (West 2002). Section 2—27(a—5) provides that the court may:

> "with the approval of the Department of Children and Family Services, place the minor in the subsidized guardianship of a suitable relative or other person as legal guardian; 'subsidized guardianship' means *a private guardianship arrangement for children for whom the permanency goals of return home and adoption have been ruled out* and who meet the qualifications for subsidized guardianship as defined by the Department of Children and Family Services in administrative rules[.]" (Emphasis added.) 705 ILCS 405/2—27(1)(a—5) (West 2002).

In addition, section 2—23 of the Act provides in subsection (3) that the dispositional order may also include "any other orders necessary to fulfill the service plan" and states:

"If the court concludes that the Department of Children and Family Services has abused its discretion in setting the current service plan or permanency goal for the minor, the court shall enter specific findings in writing based on the evidence and shall enter an order for the Department to develop and implement a new permanency goal and service plan consistent with the court's findings. The new service plan shall be filed with the court and served on all parties. The court shall continue the matter until the new service plan is filed." 705 ILCS 405/2—23(3) (West 2002).

I conclude from the statutory procedures outlined above that the setting of the permanency goal is an intrinsic part of the dispositional hearing and, thus, appealable as part of the dispositional order.

In the case at bar, the circuit court, in accord with section 2—23(3), found that the permanency goal of returning the minors to the custody and care of their mother was not appropriate in light of the fact that the mother had refused to acknowledge her own mental illness and adamantly refused to seek treatment or take medication prescribed for her. The court held that "guardianship would be the appropriate goal," ordered DCFS to set the permanency goal to guardianship, and ordered DCFS to develop a client service plan consistent with the guardianship goal. The court also ordered that the mother be allowed visitation with the minors.

The record before this court contains the four-page dispositional order, which provides a written record of the court's rulings at the dispositional hearing. The dispositional order is a preprinted form on which the court has indicated its findings and orders by checking the appropriate boxes and filling in the blanks provided. Paragraph (i) of the order provides the court with the choice of finding the permanency goal "appropriate" or "not appropriate." (Emphasis in original.) If "not appropriate" is selected, the court must give its reasons on the blank lines provided on the form. In the case at bar, the court found that the permanency goal was "not" ap-

propriate "because it should be set at guardianship because of the mother's mental health."

As a result of the circuit court's findings, including its determination that the permanency goals of return home and adoption should be ruled out, the court ordered that the minors be made wards of the court and placed in the custody and guardianship of their maternal aunts. See 705 ILCS 405/2—27 (West 2002). It is from this *dispositional order* that Perseta D. appeals. Because the court's determination concerning the appropriate permanency goal was an intrinsic part of its dispositional order, there is no reason why Perseta D. should not be allowed to challenge the court's determination as to the permanency goal.

The fact that Perseta's main objection is to the court's selection of the permanency goal does not change this result. I note that, pursuant to section 2—23(3) of the Act, visitation orders, like orders directing DCFS to set a new permanency goal, may be made a part of the dispositional order. Courts have typically allowed appeals from dispositional orders when the only objection has been to the visitation order contained therein. See *In re D.S.*, 307 Ill. App. 3d 362 (1999); *In re Beatriz S.*, 267 Ill. App. 3d 496 (1994). I see no reason, therefore, to foreclose an appeal from a dispositional order because the objection is to the permanency goal portion of the order.